[Crim. No. 8360. Third Dist. Jan. 8, 1976.]

In re ROBERT E. STANLEY on Habeas Corpus.

[Crim. No. 8427. Third Dist. Jan. 8, 1976.]

In re SAMMY JAMES REED on Habeas Corpus.

## COUNSEL

Norman Kulla, under appointment by the Court of Appeal, for Petitioners.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi, Daniel T. Dauenhauer and Brian Taugher, Deputy Attorneys General, for Respondent.

## OPINION

**FRIEDMAN, J.**—In this opinion we dispose of habeas corpus petitions of two state prison inmates who challenge the parole standards presently pursued by the California Adult Authority. These standards were announced in Directive No. 75/20, issued by the Chairman of the Adult Authority on April 15, 1975. A brief background description will aid in recognition of the issues.

The Indeterminate Sentence Law vests in the Adult Authority two distinct discretionary functions: sentence-fixing within the statutory minimum and maximum terms for the inmate's crime[1] and parole-setting.[2] In past years the Adult Authority coupled these two functions by fixing sentence only at the time it granted parole. Deferment of the inmate's parole readiness thus prolonged the indeterminacy of his sentence. In consequence, a prison inmate might wait for many years

---

[1] Penal Code, section 1168: "Every person convicted of a public offense, for which imprisonment in any reformatory or state prison is now prescribed by law shall, unless such convicted person be placed on probation, a new trial granted, or the imposing of sentence suspended, be sentenced to be imprisoned in a state prison, but the court in imposing the sentence shall not fix the term or duration of the period of imprisonment. . . ."

Penal Code, section 3020: "In the case of all persons heretofore or hereafter sentenced under the provisions of Section 1168 of this code, the Adult Authority may determine and redetermine, after the actual commencement of imprisonment, what length of time, if any, such person shall be imprisoned, . . ."

Penal Code, section 3023: "The term of imprisonment shall not exceed the maximum or be less than the minimum term of imprisonment provided by law for the public offense of which such person was convicted."

[2] Penal Code, section 3040: "The Adult Authority shall have the power to allow prisoners imprisoned in the state prisons to go upon parole outside the prison walls and inclosures. . . ."

Penal Code, section 3041: "(a) In any case the matter of parole may be determined by the Adult Authority at any time after the actual commencement of such imprisonment. . . ."

Penal Code, section 3049: " . . . any prisoner, received on or after January 1, 1948, at any state prison or institution under the jurisdiction of the Director of Corrections, whose minimum term of imprisonment is more than one year, may be paroled at any time after the expiration of one-third of the minimum term. . . ."

without either a parole date or ultimate discharge date. (See *In re Rodriguez* (1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 537 P.2d 384]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]; *In re Williams* (1975) 53 Cal.App.3d 10, 12-13 [125 Cal.Rptr. 457].)

Directive 75/20 was designed to inaugurate a new policy. In effect, it is a set of directions from the Chairman of the Adult Authority to the case-hearing representatives who recommend and the panels of authority members who establish parole and discharge dates. (See Pen. Code, § 5076.1.) As issued in April 1975, the directive included standards for the establishment of discharge (i.e., sentence-fixing) dates as well as parole dates. On June 30, 1975, the California Supreme Court filed its decision in *In re Rodriguez, supra,* holding that the authority must fix sentences within each statutory range proportionately to the culpability of the individual offender and calling attention to the distinct character of the authority's sentence-fixing and parole-granting functions. (14 Cal.3d at pp. 652-653; see also *People* v. *Wingo* (1975) 14 Cal.3d 169, 183 [121 Cal.Rptr. 97, 534 P.2d 1001].) As a consequence, the authority's chairman issued a second directive (No. 75/30, dated Sept. 2, 1975), establishing separate standards for term-fixing and limiting the April directive, No. 75/20, to the single subject of parole. We summarize the basic features of the latter:

The directive declares that every effort will be made to establish parole dates the first time the inmate appears for regularly scheduled parole consideration. For each parole applicant, it establishes a *base offense* (i.e., the most serious offense for which he is currently committed). It then directs selection of either a *typical* or an *aggravated* range for the base offense. Attached to the directive is a table of felonies with typical and aggravated ranges.[3] Exacerbating activities accompanying the crime will cause selection of an aggravated rather than typical range.

Within the appropriate base range, the panel is then to fix a *base period of confinement.* The primary factor in fixing the base period is the seriousness of the commitment offense; other factors such as the inmate's

---

[3] For example, the typical and aggravated ranges for first-degree robbery are 30 to 38 months and 36 to 44 months; for assault with a deadly weapon, 24 to 32 months and 30 to 38 months; for first degree burglary, 24 to 30 months and 28 to 34 months; for second degree burglary, 16 to 22 months and 20 to 29 months. Some crimes, such as the various homicides and the drug offenses, carry only typical ranges. Ranges for narcotics offenses are 26 to 36 months for possession, 34 to 42 months for possession for sale and 38 to 48 months for sale.

age, pattern of criminality and "serious or major disciplinary offenses"[4] may be considered. A period of confinement may be fixed below or above the base range when unusual features exist, but the reason must be noted in writing. Once the base period is selected, it may then be adjusted upward or downward. A downward adjustment of 6 to 18 months may be made for a youthful offender sentenced under Penal Code section 1202b. The base period may be increased for post-commitment offenses. Other augmenting factors are prior felony convictions and prior, concurrent and consecutive prison sentences. Each increase is expressed in a range of months for each augmenting factor. Thus, for a court-imposed term which is concurrent with the base offense, the base confinement will normally be increased by 3 to 12 months; for a consecutive term, 12 to 24 months; for a prior completed prison term, either 3 to 9 months or 9 to 24 months as indicated by the seriousness of the earlier offense.[5]

Petitioner Stanley was committed to prison in April 1972 for two separate offenses: (1) sale of drugs, an offense punishable by a term of five years to life, parole being prohibited for the first three years; (2) possession of drugs for sale, punishable by two to ten years' imprisonment, with parole ineligibility during the first two years. The sentencing court decreed that the terms were to be served concurrently. (Pen. Code, § 669.) In April 1975, after Stanley had served 3 years, the Adult Authority fixed his period of confinement as follows: 40 months (within the 38 to 48-month base range for sale of drugs), increased by 10 months (within the base range of 3 to 12 months) for his separate concurrent sentence. The fifty-month confinement resulted in a grant of parole effective in June 1976, four years and two months after his entry into prison.

Petitioner Reed was received in prison December 1974, with concurrent sentences for narcotics possession (2 to 10 years, with parole ineligibility during the first 2 years) and for possession of a gun by an ex-felon (up to 15 years). His record included a prior Dyer Act conviction. He was entitled to credit for confinement prior to judgment.

---

[4] The quoted phrase apparently refers to offenses committed in prison subsequent to commitment for the base offense.

[5] The general tenor of these directions is illustrated by the following excerpt from Directive 75/20: "If the inmate has received concurrent or consecutive sentences as part of the present commitment, the base period of confinement should be extended for a period within the suggested ranges commensurate with the seriousness of the concurrent or consecutive sentences, unless unusual factors justify setting it outside the suggested ranges."

In July 1975 the Adult Authority entered a parole order, specifying confinement of 26 months (selected from the base range of 26 to 36 months) for narcotics possession, plus 9 months for the firearm offense and 3 months for the Dyer Act conviction, decreased by approximately 9 months for the pre-judgment confinement. The adjusted period of prison confinement was thus fixed at 29 months, resulting in a parole date of May 1977.

The two petitioners, in propria personam, raised a relatively narrow objection. They argued that the Adult Authority, acting under Directive 75/20, had postponed their parole dates by utilizing the concurrent sentences as an augmenting factor, thereby destroying the concurrency decreed by the sentencing court; that the Adult Authority's action transcended constitutional limits, being a partial nullification of a judicial act. We appointed counsel for the two petitioners and briefs were filed. It is now evident—and we have so informed counsel—that the issue transcends that originally presented. ■ The issue is whether Directive 75/20, as a unitary administrative regulation, complies with the central objectives of the Indeterminate Sentence Law. We hold that it does not.

I

■ A cardinal principle holds that administrative regulations must conform to the enabling law; that an administrative agency has no discretion to exceed the authority conferred upon it by statute. (*California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237, 242 [113 Cal.Rptr. 154, 520 P.2d 970].) The question before the reviewing court is not the wisdom of the agency's rule or policy, but whether it would alter or amend the statute. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 738 [63 Cal.Rptr. 689, 433 P.2d 697].) ■ An agency may not adopt a rule which diminishes its own statutory authority. (*Cal. Drive-In Assn.* v. *Clark* (1943) 22 Cal.2d 287, 302 [140 P.2d 657, 147 A.L.R. 1028].)

California's current Indeterminate Sentence Law is the descendant of parole legislation first adopted in 1913 and an indeterminate sentence statute enacted in 1917. (See *Roberts* v. *Duffy* (1914) 167 Cal. 629 [140 P. 260]; *In re Lee* (1918) 177 Cal. 690 [171 P. 958].) Although it omits express enumeration of parole criteria, these criteria have emerged from six decades of judicial interpretation.

The 1913 parole law authorized the then board of prison directors to grant parole to "first termers" after one year of imprisonment. The board

attempted to circumscribe its own discretion by a rule refusing parole consideration until the first termer had served half his term. In *Roberts* v. *Duffy, supra,* the California Supreme Court nullified the rule, declaring: "The legislative policy manifested in the act was to provide . . . a system . . . whereby, notwithstanding fixed terms of sentence, a hope was to be held out to prisoners that through good conduct in prison and a disposition shown toward reformation, they might be permitted a conditional liberty upon restraint under which they might be again restored to society . . . . [¶] Service of an arbitrary fixed term which has relation to the matter of punishment cannot of itself furnish a proper or just standard by which it may be fairly determined whether or not a prisoner has repented his crime and evidenced a disposition to redeem himself, and may with safety to society be granted a parole under which to attain complete reformation. . . . [¶] [T]he purpose of the legislature in creating a parole system . . . is to permit the liberation of a prisoner on parole at the earliest period when permitted by law and when on a consideration of the merits of each individual case, parole ought, in the judgment of the board, to be granted." (167 Cal. at pp. 634, 636, 637.)

Thus, early in the history of the parole system, the California Supreme Court emphasized the significance of acceptable conduct in prison and the individual's potential for reclamation. Later, the court noted additional factors—the nature of the prisoner's offense, his age, his prior associates, his habits, inclinations and traits of character. (*In re Schoen-garth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200]; see also *In re Sturm* (1974) 11 Cal.3d 258, 268 [113 Cal.Rptr. 361, 521 P.2d 97].) The court also took note of a 1952 declaration of Adult Authority policy, declaring that in-prison conduct and potential for rehabilitation were of " 'paramount importance.' " (*In re Minnis* (1972) 7 Cal.3d 639, 645 [102 Cal.Rptr. 749, 498 P.2d 997].) Most recently, the court has observed: "[The parole] power enables the Authority to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society." (*In re Rodriguez, supra,* 14 Cal.3d at p. 652.) Parole decisions, the court has stated, "are based in large measure on occurrences subsequent to the commission of the offense." *(Id.)*[6]

---

[6]These judicial expressions attempt only to describe the objectives of the Indeterminate Sentence Law. They do not attempt a catalog of the social objectives served or sought by punishment for crime. (See *People* v. *Morse* (1964) 60 Cal.2d 631, 642, fn. 8 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *Harmon* (1960) 54 Cal.2d 9, 27, 33 [4 Cal.Rptr. 161, 351 P.2d 329]; Packer, The Limits of the Criminal Sanction (1968) pp. 34-70, 369-371; Morris & Hawkins, The Honest Politician's Guide to Crime Control (1969) pp. 253-262.)

"Contemporaneous exposition is in general the best." (Civ. Code, § 3535; *Carter v. Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140].) Despite the Indeterminate Sentence Law's lack of explicit parole-setting standards, six decades of continuing exposition by the state's highest tribunal have produced a comprehensive articulation of those standards. In short, a discerned and mandatory objective of California's adult parole legislation is recognition of the inmate's post-conviction history and his potential for safe release as indispensable considerations in parole setting.

## II

Although *Roberts v. Duffy* represented a fundamental inquiry into parole objectives, the decision turned on a relatively narrow question— validity of an agency rule which interfered with a right to apply for parole accorded prisoners by the 1913 parole law. Later decisions have considered the validity of other correctional rules and policy statements, formal and informal, without acknowledging the inquiry as one in the general field of administrative rule-making. (*In re Winn* (1975) 13 Cal.3d 694, 699 [119 Cal.Rptr. 496, 532 P.2d 144]; *In re Minnis, supra,* 7 Cal.3d 639; *In re Jordan* (1972) 7 Cal.3d 930 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Van Geldern* (1971) 5 Cal.3d 832 [97 Cal.Rptr. 698, 489 P.2d 578]; *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640]; *In re Ferguson* (1961) 55 Cal.2d 663 [12 Cal.Rptr. 753, 361 P.2d 417].)

In construing the Indeterminate Sentence Law's delegation of parole power, the Supreme Court has observed that the Adult Authority is obliged to consider *all* the relevant factors; that "the Authority cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature." (*In re Minnis, supra,* 7 Cal.3d at p. 645.)[7]

 Measured against the unabridged norms of the Indeterminate Sentence Law, Directive 75/20 displays noteworthy omissions. It bases the period of confinement primarily upon the nature of the principal commitment offense, supplemented by mathematical increments for additional precommitment offenses. It recognizes in-prison behavior

---

[7]Other courts place more weight on the prisoner's record of crime. (*In re Wilkerson* (1969) 271 Cal.App.2d 798, 804 [77 Cal.Rptr. 340]; *In re Harris* (1947) 80 Cal.App.2d 173, 178 [181 P.2d 433].) We abstain from any argument over the relative primacy of various parole factors. It is enough to say that the Adult Authority must apply all the factors. *(In re Minnis, supra.)*

only as a negative determinant, directing extensions of confinement for post-conviction breaches. It withholds recognition of acceptable in-prison conduct, reclamation potential and post-release social safety as affirmative factors gravitating toward early release.[8] Although the Adult Authority may give close attention to psychiatric evaluations, the directive ignores premonitions of danger which are not revealed by overt misbehavior. Its table of fixed time-increments forms a mechanical, across-the-board standard which militates against individualized consideration. It substitutes a mechanized tit-for-tat in place of discriminating individual judgment.

In the selection of a "base period of confinement" Directive 75/20 puts forth seriousness of the commitment offenses as the prime parole determinant. Criminal history is one factor, undeniably a significant one, in parole setting. Empirical studies do indeed fortify the relative reliability of past criminality as a predictive factor. (See Morris, The Future of Imprisonment (1974) pp. 33-34.) They tend to support the view that in-prison behavior is frequently an unreliable indicator of post-release behavior; that predictions of post-release danger gain little certainty with the passage of confinement time. (Goldfarb & Singer, After Conviction (1973) pp. 278-282; Hood & Sparks, Key Issues in Criminology (1970) pp. 183-192; Morris, *op. cit.*, p. 35.) There is little basis, moreover, for the belief that correctional programs administered in existing prisons fulfill a rehabilitational purpose.[9] An offender's reclamation may stem from his own character regardless of institutional aids and

---

[8] A summary of a study by the California State Bar Committee on Criminal Justice charges that Directive 75/20 abandons rehabilitation as a criterion for fixing initial release dates. (Murray et al., *Prison Reform: Backward or Forward?* (1975) 50 State Bar J. 356, 358.)

[9] A study sponsored by the Federal Law Enforcement Assistance Administration (LEAA) declares: "Mounting evidence of the ineffectiveness of correctional treatment programs for confined offenders has led to a new body of opinion about the role of the prison. . . . Although it is appropriate to provide prisoners with opportunities for self-help, there is no evidence that treatment prescribed and administered by institutional staff has any positive effect." (National Advisory Com. on Crim. Justice Standards and Goals, Rep. on Corrections (1973) p. 497; see also Morris, *op. cit.*, 14-22, 26-27.)

Nevertheless, correctional analysts continue to urge institutional reforms designed to facilitate rehabilitational programs and goals. The National Advisory Commission urges that correctional agencies immediately develop and implement rehabilitative practices; that a rehabilitative purpose ought to be implicit in the sentence of offenders. (Report, *supra*, pp. 43-44.) A committee of the State Bar of California calls for the destruction of San Quentin and Folsom prisons and their replacement with facilities "designed to allow maximum rehabilitative efforts." (Murray et al., *op. cit.*, fn. 8, at p. 396.)

institutional handicaps.[10] Penologists have sought to develop statistical or "expectancy" tables as predictive supports for parole decisions; few, if any, advocate their use as a substitute for individual case studies and for relatively subjective evaluations. (National Advisory Com. Rep. on Corrections, *supra,* p. 416; Rep. by the President's Com. on Law Enforcement and Admin. of Justice, The Challenge of Crime in a Free Society (1967) pp. 141, 260; Glueck, *Predictive Devices and Individualized Justice* (1958) 23 Law & Contemp. Prob. 461.)

Validity of the chairman's directive does not turn on such inquiries. The judicial function is to consider the directive's validity, not its wisdom. (*Morris* v. *Williams, supra,* 67 Cal.2d at p. 737.) As presently framed, the Indeterminate Sentence Law is grounded upon the assumption that an inmate's in-prison responses supply a basis for measuring his progress toward rehabilitation, thereby permitting predictions of post-release behavior, good or ill, which will supply guidance in fixing his release date. "Service of an arbitrary fixed term . . . cannot of itself furnish a proper or just standard by which it may be fairly determined whether or not a prisoner . . . may with safety to society be granted a parole. . . ." (*Roberts* v. *Duffy, supra,* 167 Cal. at p. 636.)

The chairman's directive of April 1975 gives primacy to the factor of prior criminality, leaving to silence and implication the factors of individual reclamation and post-release expectations. It does not exclude the latter factors; neither does it acknowledge them. If only by silence, it relegates them to neglect. Its emphasis on prior offenses may as easily induce premature release of a predictable recidivist as delayed release of a predictably trustworthy prisoner. It disregards the law's demand to weigh all, not part, of the relevant factors. *(In re Minnis, supra.).* Its reliance upon a table of time increments clashes with the statute's discerned demand for reasoned individualization. Similar criminal histories may characterize utterly dissimilar individuals. "If every offender in a like legal category receives identical punishment, prisoners do not receive individualized consideration. Such a policy violates the

---

[10] One authoritative study observes: " . . . the conduct and reaction of a prisoner to a program that is largely punitive and offers little in the way of opportunity for self-improvement can reveal personality qualities also. If a person exposed to unhealthy confinement conditions is able to avoid deterioration and use his time constructively, the outlook is good." (National Council on Crime and Delinquency, Council on Parole, *Guides for Parole Selection* (1963), quoted in Orland, Justice, Punishment, Treatment (1973) p. 428).

spirit and frustrates the purposes of the Indeterminate Sentence Law and the parole system." (*In re Minnis, supra,* 7 Cal.3d at p. 645.)

## III

Despite these deficiencies, it is difficult to reach a categorical judgment of invalidity. In support of the directive, the Attorney General emphasizes its elasticity. The case-hearing panels are not limited to rigid time intervals, but may select confinement periods within fairly generous ranges. The selective process thus supplies breathing space for discretion, individualization and recognition of post-conviction progress. The confinement ranges are only "suggested." If the table of ranges lacks suitability in individual instances, the panel members may move outside the ranges (provided they explain their reasons in writing). After an initial release date has been set, Adult Authority Policy Statement No. 1 (revised and reissued Feb. 14, 1972) permits its advancement in "exceptional and unusual cases," when an inmate makes an exceptionally good adjustment or is offered an exceptional employment opportunity.

These ameliorative features do not rescue Directive 75/20 from invalidity. Flexibility within the predetermined confinement ranges is not the equivalent of an express direction to apply the Indeterminate Sentence Law's mandatory parole standards. The directive leaves mandatory criteria in the corners of the field, awaiting an occasional gleaner. Administrators, like other humans, tend to obey visible direction signs and ignore the invisible ones. Left to stand, the directive would permit disregard of indispensable standards.

A recent development emphasizes the centrality of individualized parole decisions. Relative to the Adult Authority's sentence-fixing function, *In re Rodriguez* holds that within each statutory range the authority is constitutionally compelled to fix a "primary term" which is not disproportionate to the culpability of the individual offender. (14 Cal.3d at p. 652.) Parole setting, *Rodriguez* declares, requires consideration of post-conviction behavior; sentence-fixing, conversely, "must reflect the circumstances existing at the time of the offense." *(Id.)* The concept of a constitutionally compelled primary term imparts a degree of rigidity to the Adult Authority's sentence-fixing function. Only the parole function retains its pristine elasticity, permitting release, retention, reconsideration, rescission and resetting as dictated by post-conviction developments. The shortcomings of the chairman's April directive are enlarged by *Rodriguez.* Its mechanistic resort to past criminality runs

counter to the accentuated need for periodic, individualized review of parole potential.

The invalidity of the chairman's directive should not discourage future standards to flesh out the bare bones of the parole law. Published rules and guides supply structure to amorphous discretionary powers.[11] As a safeguard against arbitrary dispensations of liberty and confinement, formal standards complement the Adult Authority's written statement of decisional reasons. See *In re Sturm, supra,* 11 Cal.3d at pp. 268-272.) In a field where individualized decisions are a discerned objective, flexibility and uniformity coexist in unavoidable tension. Well-conceived standards assist in achieving individualization and in reducing inexplainable disparities to a minimum. Our present decision emphasizes only that official parole standards may not ignore essential criteria and objectives of the Indeterminate Sentence Law.

## IV

■ We turn to two minor points before closing this opinion. Because it represents a recurring problem, we consider petitioners' claim that confinement extensions grounded on concurrent sentences invade the judicial sphere. The claim rests on the thesis that the sentencing court exercises judicial authority when it imposes concurrent instead of consecutive sentences (*In re Sandel* (1966) 64 Cal.2d 412, 415-416 [50 Cal.Rptr. 462, 412 P.2d 806]); that parole deferment for a concurrent sentence makes it consecutive in practical effect; that the authority, an agency of the executive branch, may not interfere with a judicial act. (See *People* v. *Tenorio* (1970) 3 Cal.3d 89, 94-95 [89 Cal.Rptr. 249, 473 P.2d 993].)

Concurrency affects the offender's prison term directly, his parole only indirectly. It means that two sentences will run together during the time the periods overlap. (*In re Roberts* (1953) 40 Cal.2d 745, 749 [255 P.2d 782].) Relative to parole, it avoids the two-year ineligibility period

---

[11] A noted analyst of public law points out the difference between administrative rules which limit discretion and those which structure it. (Davis, Discretionary Justice (1969) p. 97.) He also supplies an illuminating description of an unstructured parole board in action. (*Id.,* pp. 126, 133.) In fairness, it should be observed that the board in question, the United States Board of Parole, has since promulgated a set of published rules. (See also Dawson, *The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice* (1966) Wash. U. L. Q. 243; National Council on Crime and Delinquency, *Guides for Parole Selection, supra,* fn. 10; Goldfarb & Singer, *op. cit.,* pp. 282-287; *The California Adult Authority* (1972) 5 U.C. Davis L.Rev. pp. 360, 373-376.)

caused by consecutive sentences (Pen. Code, § 3043) and permits release after service of one-third the minimum for the single, more serious offense (Pen. Code, § 3049). Though concurrency hastens parole eligibility, it does not accelerate parole suitability. The crime culminating in the lesser, concurrent sentence is part of the inmate's history of criminality, thus a lawful parole factor. (*In re Wilkerson, supra,* 271 Cal.App.2d at p. 804.) Its inclusion in the array of factors influencing the length of confinement does not impair judicially decreed concurrency.

The Adult Authority is directed to provide petitioners Stanley and Reed new parole hearings conforming to the views expressed in this opinion, the hearings to take place within 30 days after this opinion becomes final. In other respects, both petitions are denied and the orders to show cause discharged.

Puglia, P. J., and Paras, J., concurred.

Petitions for a rehearing were denied on January 29, 1976, the opinion and judgment were modified to read as printed above, and the following opinion was then rendered:

THE COURT.—As counsel for the Adult Authority, the Attorney General has filed a petition for rehearing contending that our opinion of January 8, 1976, failed to recognize a section of the chairman's April 1975 directive which, according to the Attorney General, is "designed to recognize conduct in prison and each individual's potential for reform."

This court by no means ignored the provision in question. In our opinion we referred to Adult Authority Policy Statement No. 1, which permitted parole advancement in "exceptional and unusual cases."[1] It seemed to us then, that the Adult Authority's policy statement had the same general objective as the provision allegedly ignored. ■ The latter provision declares that after an initial parole date has been set, it "may be subsequently reviewed if the inmate wishes;" that the review hearing will take place after lapse of two-thirds of the period between sentence-fixing and the initial parole date; that "it is the responsibility of the inmate to demonstrate unusual rehabilitation." The provision goes on to declare: "Any inmate who participates to an unusual degree in rehabilitative programs and can demonstrate his rehabilitation will have the opportunity to do so at this review hearing."

---

[1] In his petition for rehearing the Attorney General informs us for the first time that this portion of Adult Authority Policy Statement No. 1 has been deleted.

The Attorney General's argument would stretch a narrow provision beyond its apparent scope. The provision does not inject a routine or required standard into the Adult Authority's parole-fixing decisions. It expressly designates the procedure as a review. It takes place after the lapse of what may be many months. It places upon the inmate the burden of demonstrating *unusual rehabilitation.* It falls far short of recognizing in-prison behavior and progress toward law-abiding conduct as routine, mandatory criteria.

It is quite apparent that the Adult Authority finds itself in a dichotomous position. According to the Supreme Court, the authority is obliged to act promptly in fixing sentences of prisoners committed for an indeterminate sentence. (*In re Rodriguez* (1975) 14 Cal.3d 639, 654, fn. 18 [122 Cal.Rptr. 552, 537 P.2d 384].) Conceivably, parole setting calls for comparable promptness. Comparable promptness, on the other hand, is difficult when the Adult Authority is required to include in-prison conduct and observation among the predictive factors. The Supreme Court has made it clear that parole consideration must be guided in large measure on post-conviction history. (*Id.,* at p. 652.) As the Attorney General puts it: " . . . it is not clear whether it is permissible to adopt any system which would allow an early but tentative decision on parole release."

The constitutional considerations which impel promptness in sentence-fixing are not present in parole setting. (See *In re Rodriguez, supra,* 14 Cal.3d at pp. 652-654.) Within the limitations imposed by statutory parole-eligibility dates, the time period between term commencement and parole hearing is primarily a matter of administrative choice. Readiness for parole varies from one prisoner to another. Among the decisions available to the Adult Authority when an inmate first appears before it are: (a) to fix his parole date, (b) to deny it, and (c) to defer parole setting until the authority finds itself able to make a responsible, rational and realistic decision. Nothing in the Indeterminate Sentence Law demands a one-stage decisional process or prevents a two-stage procedure, the first stage based upon evaluation of the inmate early in his confinement, the second later in his confinement. The judicially discerned objectives of the statute are accomplished by either procedure, provided that in-prison conduct and progress toward rehabilitation are incorporated in the procedure as routine, mandatory standards.

These objectives are not accomplished by the process described in the chairman's April 1975 directive—parole setting based on pre-

confinement history, to which is appended a later, optional review pivoting on the narrow and uncertain standard of "unusual rehabilitation."

The petition for rehearing informs us that the full Adult Authority on December 30, 1975, adopted rules incorporating the provisions of the chairman's April 1975 directive. It also points out that legislation has been enacted which places the rule-making actions of the Adult Authority under the Administrative Procedure Act and requires it to reconsider existing rules and regulations prior to July 1, 1976. (Stats. 1975, ch. 1160; Pen. Code, § 5076.2.) These factors were brought to our attention only when the petition for rehearing was filed. They eliminate any question as to the comparative powers of the chairman and the Adult Authority in the adoption of the parole-setting standards considered in our opinion. (It follows that the legal question raised in footnote 6 of our January 8, 1976, opinion has been eliminated. Footnote 6 is hereby deleted from the opinion. The publishers of the opinion are requested to renumber subsequent footnotes.)

Petitioner Stanley has filed a separate petition for rehearing, pointing out that he did in fact exhaust his administrative remedies by appealing his parole decision to the Adult Authority itself. At the time the parties filed their pleadings and briefs, the matter was of no apparent significance, because the Court of Appeal, Fourth District, Division Two, had not yet filed its decision applying the exhaustion doctrine. (*In re Muszalski*, 52 Cal.App.3d 500 [125 Cal.Rptr. 286], filed Oct. 27, 1975.) It follows that petitioner Stanley is entitled to the same relief as petitioner Reed. We therefore delete the last two paragraphs of our January 8, 1976, opinion and insert the following in lieu thereof:

"The Adult Authority is directed to provide petitioners Stanley and Reed new parole hearings conforming to the views expressed in this opinion, the hearings to take place within 30 days after this opinion becomes final. In other respects, both petitions are denied and the orders to show cause discharged."

As to petitioner Stanley, the opinion and decision are modified as above set forth and his petition for rehearing is denied. The petition for rehearing filed by the Attorney General is denied.

Respondent's petition for a hearing by the Supreme Court was denied March 31, 1976. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.