STATE of Minnesota, ex rel. Ruth
TAYLOR, Petitioner, Appellant,

v.

Kenneth SCHOEN, Commissioner, Minne-
sota Department of Corrections, et
al., Respondents.

No. 48240.

Supreme Court of Minnesota.

Sept. 22, 1978.

James P. Cullen, Minneapolis, Amicus: Legal Assistance to Minnesota Prisoners, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Gary Hansen, Sp. Asst. Atty. Gen., St. Paul, for respondents.

SCOTT, Justice.

This is an appeal from an order of the Scott County District Court issued June 27, 1977, and a subsequent order of the same court of September 14, 1977, denying appellant's motion for release from the custody of the Department of Corrections. Appellant claims that the Minnesota Corrections Board (MCB)'s "parole release date matrix" is an invalid decision-making tool, the application of which to her case has resulted in mechanical, arbitrary, and capricious action by the MCB amounting to a denial of due process of law.

Appellant pled guilty to first-degree manslaughter on May 30, 1975, having originally been charged with first-degree murder. Ill will between two women she had known culminated in two violent incidents on October 18, 1974. One of the women, a Ms. Jenkins, beat appellant in a fistfight and was then shot and killed shortly afterward by the other, a Ms. Hammick. Appellant was an accomplice to the shooting in that she drove Ms. Hammick to and from the scene. She was sentenced to 0–7 years.[1]

She began serving her sentence at the Minnesota Correctional Institute for Women on July 11, 1975. In September 1975 she appeared before the Minnesota Corrections Board.[2] Parole was denied because of (1) "the seriousness of [her] offense," and (2) "[her] apparent need for a controlled environment." Ronald Byrnes, the member of the Minnesota Corrections Authority who prepared her Parole Denial Report, checked off the following "items which we believe may accelerate your rehabilitation and possible parole": "[a]lcohol treatments, [i]nsight into your problems with increased ability to handle your own problems,

[a]ccepting consequences of your behavior," and "[d]evelopment of personal goals which will lead to a mature life style." Byrnes also wrote as "General Comments": "You were involved in a great tragedy. Maybe now you will see the need to grab hold of your life." Evaluation of her eligibility for parole was continued for one year.

During this year, she completed a chemical dependency program and attended Alcoholics Anonymous meetings regularly. She moved from "level three" to "level five" status as an inmate by carrying out agreements with her caseworkers; "level five" is the highest level possible, and entitled her to live in an honor cottage. In May 1976, she received her legal high school equivalency certificate.[3]

On September 15, 1976, appellant reappeared before the MCB. Parole was again denied. At this appearance, however, she was informed that her target release date was January 11, 1979, 42 months from her date of admission to the institution. This decision by the MCB was unanimous. In addition to reviewing appellant's psychological evaluations, her progress reports, and interviewing her case worker, the MCB had utilized the newly developed and implemented "parole release date matrix system" in its decision to deny appellant parole, and assignment of a target release date.

As an aid to parole decision-making, the MCB had begun using the matrix in June 1976. The matrix was the end result of a project undertaken by the MCB to develop decision-making guidelines to structure the exercise of their discretion.[4] The project's aim was to develop a rational process to vary the time served until parole. As developed, the matrix is a grid containing 45

1. Under Minn.St. 609.20, she could have seen sentenced to 0–15 years.

2. The board was then known as the Minnesota Corrections Authority.

3. Since November 1976 appellant has been allowed to work five days a week at a McDonald's restaurant in Eden Prairie.

4. The 1973 Legislature established the MCB as the state's first full-time parole board, but did not establish criteria to be used in making pa-

role decisions. The Board came into existence on January 1, 1974, and on February 1, 1974, submitted a grant application to the Governor's Commission on Crime Prevention and Control to develop decision-making guidelines to structure the exercise of their discretion. The project was funded in June 1974, became operational in October 1974, and was completed in June 1976.

boxes formed as follows: a horizontal axis is divided into five "risk of failure" levels,[5] a vertical axis is divided into nine "severity" levels.[6] A different number appears in each box where these axes intersect on the grid. This number represents the number of months an inmate with a specific risk of failure and offense severity level can expect to be incarcerated prior to parole.

Appellant brought a petition for a writ of habeas corpus and an action for a declaratory judgment, claiming: that she had not had access to the guidelines used in the parole decision-making process prior to the September, 1976, denial; that she had not received reasons for this denial; that the MCB had failed to consider the individual circumstances of her case; that the MCB's use of the matrix constitutes imposition of a minimum sentence contrary to Minn.St. 609.11; that use of the matrix undermines the sentencing authority of the trial court; that reliance on the matrix does not, contrary to the spirit of Minn.St. 609.01, properly take into account rehabilitative efforts by inmates; and that the MCB had denied her due process and equal protection of law.

On June 27, 1977, the district court ordered the MCB to provide appellant with "substantive reasons in writing for denial of her parole at the September 15, 1976, hearing * * *." In all other respects her petition was denied. Pursuant to the order, Mr. Byrnes, Mr. Llewellyn H. Linde, and Mr. Lester Melchert wrote to appellant as follows:

"In reviewing your case we noted that you had pleaded guilty to first degree manslaughter and that you had none of the nine characteristics which we have found are strongly identified with failure on parole. Therefore, using the Parole Decision-Making Guidelines, we assigned you the earliest possible release date consistent with the serious offense you committed.

"In making this decision we were cognizant of the fact that you had no prior record, the fact that you were serving a limited zero to seven year sentence, and the fact that you had obtained Level V honorary status within the institution. Nonetheless, we felt, and still feel, that the extreme seriousness of your offense clearly outweighed these factors and any other factors in your favor and that the only appropriate target release date was that indicated by the Parole Decision-Making Guidelines—January 11, 1979."

Appellant then moved for release from custody on the ground that this letter failed to provide adequate "substantive reasons." This motion was denied by the district court on September 14, 1977. The memo attached to his findings reads in part as follows:

"The court is of the opinion that the reasons given by the Board for denying parole earlier than the date called for by the Parole Decision Making Guidelines was substantive and was not an impermissible, arbitrary reason under the law and hence was in compliance with the June 27, 1977, order of this court, *Childs v. Board of Parole* ([167 U.S.App.D.C. 268] 511 F.2d 1270) and *Johnson v. Parole Board* ([2 Cir.] 500 F.2d 925—judgment vacated as moot—419 U.S. 1015 [95 S.Ct.

5. The risk of failure levels were conceived and designed to allow the MCB to utilize an empirical parole-outcome prediction instrument as an aid to their clinical judgment. To develop this instrument, random samples of cases paroled were used. The study measured the relationship between background items and failure on parole. Several prediction devices were constructed using different methodologies and combinations of background items. The prediction instrument finally selected consisted of nine items of background information as shown on a Risk of Failure Worksheet. The more of these items present in a group of cases, the higher the risk of failure on parole for that group.

The prediction instrument predicts failure rates for groups of similar inmates, not for individual inmates. Thus, the Board retained discretion to depart from the instrument if they believe the prediction is invalid in an individual case. The prediction instrument is a classification device to guide and structure, but not eliminate, the Minnesota Corrections Board's discretion.

6. These levels rank the severity of offenses hierarchically, from offenses like forgery (level 1) to murder, first degree (level 9).

488, 42 L.Ed.2d 289]) to the contrary, notwithstanding. Here, the Board ruled that participating, albeit passively, in the shooting of a person, thereby causing death, is a serious crime and that under all of the circumstances of this particular case it required 42 months of incarceration of the petitioner. If the sole purpose for incarcerating a criminal is to rehabilitate him, then possibly the holdings in the Federal cases cited by the petitioner might have some validity, but such is not the case.

"Many considerations are embodied in a prison sentence, not the least of which are punishment, example or deterrence, and protection of the public, as well as the rehabilitation concept. This court takes the view that in its ruling in the case at bar the Corrections Board merely rediscovered these long overlooked considerations and, hopefully, reestablished them with a higher priority than has been their lot in recent years."

This case presents the following issues for determination:

(1) Do the requirements of due process apply to parole release decision-making and, if so, what process is due?

(2) Did the MCB's use of the matrix exceed its statutory authority or invade the inherent power of the court?

(3) Does the application of the matrix to female inmates deny them equal protection or otherwise subject them to unlawful sex discrimination?

 1. In *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972), the United States Supreme Court articulated a two-part analysis for determining whether due process standards apply in a particular situation:

"* * * Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly,* 397 U.S. 254,

263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)."

Applying this analysis to parole release determinations, five of the seven circuit courts of appeals which have considered the issue have found that minimum due process standards apply. *Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz,* 576 F.2d 1274 (8 Cir. 1978); *Franklin v. Shields,* 569 F.2d 784 (4 Cir. 1977) (division of three), rev'd in part on other grounds 569 F.2d 800 (4 Cir. 1978) (en banc), cert. denied, 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978); *U. S. ex rel. Richerson v. Wolff,* 525 F.2d 797 (7 Cir. 1975), cert. denied, 425 U.S. 914, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976); *Childs v. U. S. Board of Parole,* 167 U.S.App.D.C. 268, 511 F.2d 1270 (1974); *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* 500 F.2d 925 (2 Cir. 1974), vacated as moot, sub nom. *Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974). *Contra, Scott v. Kentucky Parole Bd.,* No. 74–1899 (6 Cir. Jan. 15, 1975), vacated for consideration of mootness, 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976), on remand sub nom. *Bell v. Kentucky Parole Bd.,* 556 F.2d 805 (1977); *Scarpa v. United States Bd. of Parole,* 477 F.2d 278 (5 Cir. 1973) (en banc), vacated for consideration of mootness, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44, dismissed as moot, 501 F.2d 992 (5 Cir. 1973).

In *Childs v. U. S. Board of Parole, supra,* the court, in reference to the *Morrissey* analysis, concluded that an inmate who is denied parole suffers a grievous loss, thus satisfying the first part of the *Morrissey* test. In so doing, the court reasoned:

"* * * The Board holds the key to the lock of the prison. It possesses the power to grant or to deny conditional liberty. In the exercise of its broad discretion it makes judgments concerning the readiness of an inmate to conduct

himself in a manner compatible with the well-being of the community and himself. If the Board's decision is negative, the prisoner is deprived of conditional liberty. * * * " 511 F.2d 1278.

The second part of the *Morrissey* test is also satisfied. The court in *United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra,* relying upon the Supreme Court's decisions in *Morrissey v. Brewer, supra,* and *Graham v. Richards,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), found that the prospect of parole is indeed an interest within the scope of the liberty concept embodied in the Fourteenth Amendment. As the court stated:

"* * * Parole was thenceforth [after *Morrissey* and *Graham*] to be treated as a 'conditional liberty,' representing an 'interest' entitled to due process protection. A prisoner's interest in prospective parole, or 'conditional entitlement,' must be treated in like fashion. To hold otherwise would be to create a distinction too gossamer-thin to stand close analysis. Whether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration." 500 F.2d 928.

Consistent with the above cases we hold that parole release decision-making must be conducted in accordance with the due process requirements of the Fourteenth Amendment.

■ We must next determine what process is due. The resolution of this question is guided by the considerations set out in the recent Supreme Court case of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). There the Court stated:

"* * * our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, includ-

ing the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (Citations omitted.)" 424 U.S. 334–35, 96 S.Ct. 903, 47 L.Ed.2d 33.

Applying these three factors to the parole release decision-making process, the well-reasoned Eighth Circuit Court of Appeals decision in *Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz, supra,* determined that the following due process standards are applicable:

"* * * as a minimum the due process clause of the Fourteenth Amendment requires the following: (1) Every inmate is to receive a formal parole hearing upon first becoming eligible for parole. Subsequent hearings are to be allowed in the discretion of the Board. (2) Each inmate is to receive a written notice of the date and hour of the hearing reasonably in advance. This notice shall contain a list of the factors which may be considered by the Board in making its determination. (3) Subject to security considerations, every inmate is allowed to appear in person before the Board and present documentary evidence in support of his application. In the absence of unusual circumstances an inmate does not have a constitutional right to call witnesses in his behalf. (4) A record of the proceedings which is capable of being reduced to writing must be maintained. (5) Within a reasonable time following the hearing, each inmate to whom parole was denied must be given a full and fair explanation, in writing, of the essential facts relied upon and the reasons for denial of parole." 576 F.2d 1285.

We adopt these standards; a balancing of the pertinent factors shows them to be constitutionally mandated. See, *Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz, supra,* 576 F.2d 1282.

■ The record shows that these due process standards were satisfied in this case. As the trial court noted, appellant admitted that during her classification committee meeting (held two weeks before her

formal parole hearing) she and her case worker discussed the matrix and its application to appellant. On September 15, 1976, following proper notice, appellant appeared before a panel of the MCB for a formal parole hearing. The parole hearing was recorded and transcribed and placed in appellant's file, to which she was allowed access. Shortly after the hearing, appellant was provided with a document in the form of a checklist indicating her target release date. Pursuant to an order of the trial court on June 27, 1977, the Board provided written reasons, set forth above, for the setting of the parole release date.[7] The record therefore reflects complete compliance with minimum due process standards that we now hold are required.

■ 2. At present Minn.St. 609.11 indicates a legislative preference for indeterminate sentencing. Appellant claims that the matrix represents a form of determinate sentencing in that:

(a) a majority, approximately 65 percent of all inmates, ultimately serve the times indicated by the matrix;

(b) this time is fixed, in each case, relatively early during an inmate's incarceration, after which the inmate is afforded "paper review" but no more personal hearings (in appellant's case, the target release date was set after 14 months); and

(c) once an inmate has been assigned a target release date by the matrix, release cannot be accelerated by "education, vocational training, job assignments, [or] treatment."

The state's contention is that the matrix functions only as a guide, and that, in appellant's case, a number of factors were considered in addition to the time indicated on the matrix before her target release date

was set at 42 months from commitment. The matrix is an attempt, in other words, to impart some uniformity or consistency to the decision-making process. See, generally, *In re Stanley,* 54 Cal.App.3d 1030, 1042, 126 Cal.Rptr. 524, 532 (1976), on usefulness of guidelines in the parole process.

In the past, inmates had no firm idea of when they would be released until the final hearing at which it was decided that they would receive a parole. Nor did the Board know what their action was likely to be until then, and many times it was based upon "hunch." These weaknesses are the target of the new guidelines, and they at least should end the disparities in the parole process of the past. They are an improvement upon past practices.

As we have indicated, the matrix system is merely a set of guidelines, based upon many considerations as explained above. It is not a determinate sentence. The most critical accusation may label it a determinate parole system, but we see no statutory violation in this.

■ A related issue is whether use of the matrix usurps the sentencing function of the trial court. In *Lupo v. Norton,* 371 F.Supp. 156 (D.Conn.1974), it was suggested that inmates who thought it was the trial court's role to respond to the severity of their offenses might be confused to find this factor prominent in Federal parole guidelines. The court continued:

"Indeed, judges may well wonder why the Board's guideline table and its specified reasons for parole denial make no reference to the length of sentence imposed. They may even wonder why parole guidelines specify various *time periods of confinement* correlated with various offense categories, rather than vari-

---

7. We, too, ascribe to the view that: " * * * for a statement of reasons to satisfy minimal due process requirements 'detailed findings of fact are not required, provided the Board's decision is based upon consideration of all relevant factors and it furnishes to the inmate both the grounds for the decision * * * and the essential facts upon which the Court's inferences are based * * *.' *United States ex rel. Johnson v. Chairman, N. Y. State Bd. of*

*Parole,* supra, 500 F.2d at 934. See *United States ex rel. Richerson v. Wolff,* supra; *Cooley v. Sigler,* supra, 381 F.Supp. at 443; *Candirini v. Attorney General,* 369 F.Supp. 1132, 1137 n. 8 (E.D.N.Y.1974). Cf. *Franklin v. Shields,* supra, 569 F.2d at 797–98 n. 59, 801." *Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz,* 569 F.2d 1274, 1284 (8 Cir. 1978).

ous *fractions of the sentence imposed* correlated with various offender characteristics. Under the latter approach, the Board could still ameliorate unjustified sentence disparities by prudent departure from such guidelines. By not including sentence length as a variable on the guideline table, the Board runs the risk of averaging time spent in prison for particular offenses, without regard to the factors that led sentencing judges to impose terms of different lengths." 371 F.Supp. 163. (Italics original.)

Members of the MCB testified that they took appellant's limited 0–7 year sentence into account. The chairman of the Board also stated, however, that " * * * the Board feels free to disregard limited sentences." Of course, sentences imposed by judges limit the sentences which can be applied to inmates from the matrix, as indicated above. Our indeterminate sentencing statute gives this prerogative to the parole board, whereby they may release an inmate at any time regardless of sentence, except in a few isolated instances.[8] We see no invasion of the inherent judicial power under our present procedural system.

■ 3. Because male and female inmates were "lumped together" in the statistical pool of recidivism statistics on which the "Risk of Failure" worksheet was based, it appears that the requirements of equal protection were satisfied: sentences for both men and women are calculated on the same matrix. Appellant argues, however, that because men outnumbered women in the statistical sample approximately 1700 to 40, and because the MCB recognizes that men are more likely to recidivate than women, the result is that the application of the matrix to female inmates constitutes sex discrimination. The Board chairman testified that " * * * women statistically did not recidivate at the same level as did their male counterparts."

In *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed. 225, 229 (1971), the United States Supreme Court held that a state law preferring men to women as administrators of estates was invalid:

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' * * To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; * * * "

Appellant argues that a "mandatory preference" results from the use of the matrix system, as follows: men receive target release dates based on a statistical group of inmates who recidivate slightly less than men do—because of the inclusion of the 40 + women in the sample—while women receive target release dates based on a group of inmates who recidivate more than women do. It is further claimed that in appellant's case, this disparity is aggravated by the fact that her offense falls in the same severity level with first and second degree criminal sexual misconduct and sodomy, which are chiefly committed by men.

Appellant's contention might have some merit if the matrix were the sole device used by the Board in making its determination. The state, however, contends that the matrix is "only a guide" and is not "mechanically applied." We agree, and find that under all the circumstances the matrix was legitimately used as a "guide" and does not constitute mechanical decision-making. As the record establishes, the MCB is cognizant that the matrix does not differentiate

---

8. See Minn.St. 609.12, subd. 1. Except for certain weapons offenses, and where the sentence is for life, there are no minimum terms. Minn.St. 609.11.

L.1978, c. 723, provides that there will be determinate sentences for felonies committed

after April 30, 1980. Section 9 of this act provides that there will be created a "Minnesota Sentencing Guidelines Commission" to formulate proposed sentences in accordance with policies stated in the act.

between men and women even though the recidivism rates of men and women differ. It is thus evident that the MCB may take this into account when determining how much weight should be placed on the matrix when making a particular parole decision.

Consequently, we cannot agree that the matrix violates equal protection guarantees, since the failure to distinguish between men and women in light of differing recidivism rates between the sexes occurs in only one of the devices or factors used in making parole decisions, the Board is aware of this single factor's failure to make the distinction in question, and the Board is able to rectify any inequities resulting from the application of this single factor by limiting its importance and by relying on other factors in making its decision.

A secondary claim is that appellant received unequal treatment as compared to *female* inmates whose parole applications were processed before the adoption of the matrix. *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973), requires only that "some rational basis" be found to sustain parole classifications. "Rational basis" can be found in the goals of predictability and uniformity associated with the matrix.

We therefore agree with the trial court, and hold that the decision of the Board assigning January 11, 1979, as petitioner's target date for release was not arbitrarily, mechanically or capriciously arrived at and hence petitioner's due process rights were in no way violated, and that the parole release date matrix as applied in the case at bar is not violative of Minnesota Statutes 609.01, nor of Minnesota Statutes 609.11, the minimum sentencing law of this state, nor does its use in the case at bar in any way violate petitioner's constitutional rights.

Affirmed.

YETKA, Justice (dissenting).

The state of California had an issue similar to this in the case of *In re Minnis,* 7 Cal.3d 639, 102 Cal.Rptr. 749, 498 P.2d 997 (1972). In *Minnis* the court held that a categorical denial of consideration for release at the beginning of a term violated the spirit of California's indeterminate sentencing law.

The present case presents a less extreme case than *Minnis.* Taylor was told at her first hearing that her institutional behavior could have some effect on parole eligibility. However, once her "target release date" was assigned, the record indicates that no additional institutional behavior would be considered in the paper review provided.

If the matrix system is used to assign parole release dates which then foreclose any practical possibility of the board's considering institutional behavior, the board may be seen as violating the express mandate of Minn.St. 243.06. This statute provides:

"Each prisoner shall be credited for good prison demeanor, diligence in labor and study and results accomplished, and be charged for derelictions, negligences, and offenses under such uniform system of marks or other methods as shall be prescribed by the commissioner of corrections. He shall be informed of his standing under such system each month. The commissioner of corrections shall inform the corrections board of the work progress, derelictions, negligences, demeanor and future program of each inmate of the penal institutions a month before his regular appearance before the corrections board."

This statute follows Minn.St. 243.05, which empowers the corrections board to grant parole. If the two are considered together, they arguably prevent the board from refusing to consider institutional behavior at any point.[1] If, after 14 months, the board tells a prisoner that her target release date is a set time in the future and that it cannot

---

1. See, also, Minn.St. 609.12, subd. 2, which bases parole eligibility, in part, on rehabilitation.

be reduced (but may be increased) by institutional behavior, the board is failing to exercise the discretion given it by Minn.St. §§ 243.05 and 243.06.

I believe also that the alleged sex discrimination issue has merit because of the indications that women have a lower recidivism rate than do men. Since the record in this case is inadequate to fully substantiate the claim, it seems appropriate to send the case back for additional testimony on this issue. Accordingly, I would remand the case back for further testimony on both issues raised in this dissent.

WAHL, Justice (dissenting).

I respectfully join in the dissent of YETKA, J.

ROGOSHESKE, J., took no part in the consideration or decision of this case.