[Crim. No. 10331.   In Bank.   Mar. 28, 1967.]

In re ROBERT L. SCHOENGARTH on Habeas Corpus.

Robert L. Schoengarth, in pro. per., and Ralph D. Drayton, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Robert S. Shuken, Deputy Attorney General, for Respondent.

MOSK, J.—By this application for habeas corpus petitioner challenges the power of the Adult Authority to condition its offer of parole on his agreeing to be released to the custody of Colorado representatives for trial on charges pending against him in that state, and the authority's power to redetermine his sentence upon his refusal to sign such an agreement. As will appear, both actions are within the jurisdiction of the authority. Secondly, petitioner complains that prison officials have refused to allow him to keep legal research notes in his cell, in violation of his right of reasonable access to the courts; this contention, too, is without merit.

On August 16, 1963, petitioner pleaded guilty to a charge of second degree burglary and was sentenced to state prison for the term prescribed by law. In such cases the statute provides for imprisonment for not less than one nor more than 15 years. (Pen. Code, § 461, subd. 2.) Unless validly fixed by the Adult Authority at less than maximum, petitioner's term therefore will expire in 1978. He did not appeal.

Two Colorado warrants of arrest were filed with the prison authorities, charging petitioner with the crimes of forgery and confidence game committed in that state. Petitioner alleges he asked a records officer at the prison if he could file a demand for trial on the Colorado charges. The officer replied there was no possibility of doing so, inasmuch as Colorado was not a signatory to the Agreement on Detainers (Pen. Code, §§ 1389-1389.7) and no other arrangements existed whereby petitioner could demand to be released to the custody of that state for trial. This information appears to have been correct.

On June 9, 1964, the Adult Authority declined to fix petitioner's term and parole date, and postponed the matter to its next annual calendar. On June 2, 1965, the authority fixed

petitioner's term at seven years; in the same action it granted petitioner parole effective August 2, 1965, on the special condition that he "go to hold," i.e., that he be released to the custody of Colorado for trial on the outstanding charges against him.

Despite his previously expressed desire to be returned to Colorado for this purpose, petitioner refused to sign either the parole agreement or a waiver of extradition. He stated he wished to contest the proceedings, and requested the advice of an attorney. On August 4, 1965, petitioner's motion for appointment of counsel was denied by the Monterey Superior Court, "It appearing to the Court that no cause of action has been stated. . . ."

On September 7, 1965, the Adult Authority rescinded its action of June 2 "fixing term and granting parole," and placed the matter on its next annual calendar. The rescission, of course, automatically reset petitioner's term at maximum pending further action by the authority. (Cf. *People* v. *Dorado* (1965) 62 Cal.2d 338, 358-359 [42 Cal.Rptr. 169, 398 P.2d 361].)

In November 1965 a third Colorado warrant of arrest was filed against petitioner; the charge on this occasion was possession of narcotic drugs.

Petitioner alleges that on June 1, 1966, he appeared before the Adult Authority, renewed his request for counsel, and "asked the parole board to allow me to have a discharge, and to let me go back to Colorado, to stand trial for what offenses that I had committed there." On the same date the authority accordingly refixed his term at eight years and granted him parole effective August 2, 1966, subject to the prior condition that he "go to hold." But petitioner again refused to sign the parole agreement, and "Stated that on advice of counsel, Jones, Jones, Murphy & Sturgis, Attorneys at Law, 232 Madison Street, Monterey, California, he was refusing to sign since Parole Agreement stipulated that he would be released to the custody of Denver Colorado Sheriff."

On July 6, 1966, the Adult Authority reviewed the case; it rescinded its "term fixing action" of June 1, 1966, and placed the matter on its June 1967 calendar. Petitioner's term is therefore reset at maximum until further disposition at that time.

From the foregoing facts it appears that petitioner has taken totally inconsistent positions as to what he desires the Adult Authority to do in his case: on at least two occa-

sions, according to his own allegations, he specifically asked if he could go to Colorado to stand trial on the pending charges; yet each time the Adult Authority offered him a parole that would allow him to legally do so, he refused to sign the necessary parole agreement, demanded the appointment of counsel and announced he was ''fighting extradition.'' In any event, petitioner has not shown grounds for relief under the applicable statutes.

In this state the parole power is vested in the Adult Authority. (Pen. Code, §§ 5077, 3040.) While a prisoner eligible for parole has the right to apply therefor and to have his application duly considered, he has no right to a parole at any fixed time, or at all; the decision to grant or deny parole is committed entirely to the judgment and discretion of the Adult Authority. (*Roberts* v. *Duffy* (1914) 167 Cal. 629, 640-641 [140 P. 260]; *People* v. *Ray* (1960) 181 Cal.App.2d 64, 69 [5 Cal.Rptr. 113].) ''In determining whether the privilege of parole shall be granted a prisoner, that authority is not guided solely by the good conduct of the prisoner while incarcerated. The nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation and the interests of public security are all taken into consideration.'' (*People* v. *Denne* (1956) 141 Cal.App.2d 499, 507 [297 P.2d 451], and cases cited.)

The statute further empowers the Adult Authority to impose on any grant of parole ''such conditions as it may deem proper'' (Pen. Code, § 3053). The conditions customarily invoked, for example, govern the parolee's residence, employment and civil rights, restrict his use of alcoholic beverages and motor vehicles, and forbid his possession of narcotics and weapons. But the circumstances of the case may dictate still further conditions. Thus if another sovereign asserts a claim to try a prospective California parolee for a crime committed against its own laws, the grant of parole is often conditioned on agreement by the prisoner to be released directly to the custody of that sovereign. (See, e.g., *In re Malone* (1955) 44 Cal.2d 700, 705 [284 P.2d 805] [parolee to answer charge pending in another state]; *In re Kimler* (1951) 37 Cal.2d 568, 570 [233 P.2d 902] [parolee to complete a term of imprisonment begun in another state]; *In re Marzec* (1945) 25 Cal.2d 794, 795-796 [154 P.2d 873] [parolee to return to a prison in another state from which he had escaped]; *In re Silverstein* (1942) 52 Cal.App.2d 725, 726 [126 P.2d 962]

[parolee released to federal authorities for prosecution on charge of violating laws of the United States]; cf. *In re Korner* (1942) 50 Cal.App.2d 407, 409 [123 P.2d 111] [parole on condition defendant be released to custody of immigration authorities for deportation].)

Such cooperation between two jurisdictions serves both the principles of comity and the interest of society in a safe and orderly transfer of custody of the prisoner. The latter, too, benefits from a prompt disposition of the charges against him, as it preserves his constitutional right to a speedy trial. Moreover, if he is convicted his California parole is not violated, but runs concurrently with any sentence he may be compelled to serve in the second jurisdiction (Pen. Code, § 669; see *In re Patterson* (1966) 64 Cal.2d 357, 361-362 [49 Cal.Rptr. 801, 411 P.2d 897]); if he is acquitted, he reports to the appropriate California authorities and continues on his parole subject to the remaining conditions. Indeed, without such an agreement or other permission of the Adult Authority a parolee who voluntarily goes to a sister state to stand trial "shall be held an escaped prisoner and arrested as such." (Pen. Code, § 3059.)

It follows that the special condition on the parole offered to petitioner, i.e., that he "go to hold" on the pending Colorado charges, was a legitimate and proper exercise of the Adult Authority's broad discretion under section 3053.

Doubtless, petitioner was not *required* to accept parole on this or any other condition (*In re Peterson* (1939) 14 Cal.2d 82 [92 P.2d 890]), but "this conclusion does not entitle petitioner to an absolute discharge from custody at this time, for he cannot convert the board's order into an unconditional parole merely by rejecting the condition attached" (*id.* at p. 85). In *Peterson* we adopted the general rule that "a proffered parole must . . . be accepted to be effective." (*Ibid.*) Thus by refusing to sign the parole agreement because of a valid condition which he chose not to accept, petitioner *ipso facto* rendered the grant of parole inoperative. It was then proper administrative procedure for the Adult Authority to revoke its parole offer and put the matter over to a subsequent calendar.

At the same time, the Adult Authority also rescinded its term-fixing action; petitioner's sentence was thereby returned to maximum until the next annual offer of parole, at which time it was refixed with an increment of one year over the previous term. As will appear, that action too was proper.

The Adult Authority, by statute, has exclusive jurisdiction to fix the length of time a prisoner must serve within the limits of an indeterminate sentence. (Pen. Code, §§ 5077, 3020.) One who is legally convicted has no vested right to the determination of his sentence at less than maximum (*In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080]; *In re Smith* (1949) 33 Cal.2d 797, 804 [205 P.2d 662]; *In re Byrnes* (1948) 32 Cal.2d 843, 850 [198 P.2d 685]; *In re Cowen* (1946) 27 Cal.2d 637, 641 [166 P.2d 279]), and hence the authority "may redetermine such sentences as conditions require" (*In re McLain, supra,* 55 Cal.2d at p. 84; Pen. Code, § 3020).     But although no statute declares there must be "cause" for a redetermination of sentence (compare Pen. Code, § 3063 ["No parole shall be suspended or revoked without cause"]), such a requirement has clearly emerged from the cases (*People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, 359; *In re McLain* (1960) *supra,* 55 Cal.2d 78, 87; *In re Smith* (1949) *supra,* 33 Cal.2d 797, 803).

Petitioner's conduct in refusing to accept a validly conditioned offer of parole constituted cause to refix his sentence.     "In rejecting the order of parole, he renders himself bound to serve the unexpired term of his sentence as now fixed *or subsequently modified.*" (Italics added.) (*In re Peterson* (1939) *supra,* 14 Cal.2d 82, 85.) But petitioner does not have the power to control, in so doing, the length of time he ultimately will be on parole.     To effectuate the purposes of the program the Adult Authority may properly determine that a prisoner should be on parole for a certain minimum number of years (cf. *In re Trummer* (1964) 60 Cal.2d 658, 661 [38 Cal.Rptr. 281, 388 P.2d 177]); yet parole applications are normally reviewed on an annual basis only.
It follows that when a prisoner, such as the present petitioner, causes his effective parole date to be postponed for one year by refusing to sign the necessary agreement, the Adult Authority has the power to increase his overall sentence by one year (not to exceed the statutory maximum) when it subsequently renews the offer of parole, in order to maintain the desired minimum period of supervision.

A purported "waiver of extradition" repeatedly submitted to petitioner by prison officials and finally signed by him on September 6, 1966, requires special comment. Penal Code section 1555.1, first paragraph, declares that any person charged with a crime in another state may waive formal extradition proceedings "by subscribing in the presence of a magis-

trate within this State a writing which states that he consents to return to the demanding State; provided, however, that before such waiver shall be subscribed by such person, the magistrate shall inform him of his rights to require the issuance and service of a warrant of extradition as provided in this chapter [i.e., Pen. Code, §§ 1547-1558, based largely on the Uniform Criminal Extradition Act].''

The document signed by petitioner purports to be such a waiver, but it fails to comply with the quoted requirements of the statute: it was subscribed in the presence not of a magistrate but simply of two prison officers, and there is neither recital nor showing that before signing it petitioner was informed by a magistrate of his rights under the extradition statutes. As this document appears to be a ''form'' waiver, with blank spaces to be filled in according to the case, we take this occasion to point out its fatal defects.

In the present type of proceeding, however, such a waiver is surplusage. The third paragraph of section 1555.1 provides that ''Nothing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding State, nor shall this procedure of waiver be deemed to be an exclusive procedure or to limit the powers, rights or duties of the officers of the demanding State or of this State.'' The phrase, ''voluntarily and without formality,'' typically describes the return of a fugitive who has not been in custody in the asylum state; but it is equally applicable to the transfer of a prisoner who chooses to accept a parole on the condition that he ''go to hold'' in a sister state, and manifests that consent by signing the corresponding parole agreement. In such a case, accordingly, there is no additional need for the formal waiver prescribed by the first paragraph of the statute.[1]

[1]*In re Patterson* (1966) *supra*, 64 Cal.2d 357, 364, is readily distinguishable. We there sanctioned the transfer of a prisoner to a Texas penal institution in order that he might serve his California sentences concurrently with a Texas sentence previously imposed; in the circumstances of that case, Penal Code section 669 *required* all the sentences to be concurrent. We expressed ''grave doubts'' as to whether the petitioner could be compelled to execute an advance waiver under section 1555.1 of his right to demand formal extradition proceedings if any of his California sentences remained to be served upon completion of his Texas sentence. We observed that ''An administrative agency may not exact a condition for the performance of a duty which the law makes unconditional. The wording of section 669 is unconditional; unless the trial court provides otherwise, defendant *has the right* to serve his sentences concurrently. Nothing in section 669 or in *In re Stoliker* (1957) 49 Cal.2d 75 [315 P.2d 12], suggests that the transfer of peti-

█ Contrary to petitioner's contention, there is no right to the appointment of counsel in proceedings of the Adult Authority to determine whether and under what conditions a prisoner should be granted parole. It is true that Penal Code section 3042 provides that at least 30 days before a meeting to consider the granting of a parole the Adult Authority shall send written notice thereof to the Director of Corrections and "to each of the following persons who has made request therefor," listing the trial judge, the district attorney, the investigating law enforcement agency, and "the attorney for the defendant." But this is simply a general notice statute, operative only if the defendant already has an attorney of record; it does not evince an intent of the Legislature to require the appointment of counsel at public expense for all indigent prisoners as they are scheduled for parole consideration. Nor is such appointment compelled by any constitutional mandate.

█ The proceedings of the Adult Authority are wholly administrative in nature, and that agency's determination of length of sentence or conditions of parole is not a judicial act. (See *In re Sandel* (1966) 64 Cal.2d 412, 415-416 [50 Cal.Rptr. 462, 412 P.2d 806] ; *People* v. *Ray* (1960) *supra*, 181 Cal.App. 2d 64, 68.)[2]

Finally, petitioner alleges that on June 21, 1966, the present petition was confiscated from the cell of an inmate named Sullivan, where "I had accidently left my legal papers." Petitioner and several other inmates whose papers were found in Sullivan's cell filed an application for habeas corpus in the Monterey Superior Court; after a hearing at which each was permitted to testify, the court denied the writ but ordered "all Sullivan papers and documents, which are not in violation of prison regulations, returned to petitioner Sullivan, and that all other material found in the cell be disposed of pursuant to prison regulations." Petitioner complains that the prison authorities did not return to him legal information that he had copied from books in the prison law library, and alleges he was informed by a member of the staff that "any

---

tioner is a matter of judicial or *administrative discretion.*" (Italics added.) Here, by contrast, petitioner does not "have the right" to a parole at any fixed time, or to a sentence of less than maximum; and here the fixing of that sentence and the granting of parole is very much "a matter of . . . administrative discretion."

[2]In any event, the record discloses that as of July 6, 1966, petitioner received legal advice on the question of signing the parole agreement from a Monterey law firm, and that a Carmel attorney for the American Civil Liberties Union "was also interested" in the matter.

information" copied from such books and taken to his cell "would be considered contraband and confiscated."

■ For the reasons stated in *In re Allison, ante,* p. 282 [57 Cal.Rptr. 593, 425 P.2d 193], petitioner has no enforceable right to engage in legal research so long as his access to the courts is not thereby unreasonably impaired. ■ In *Allison* we found to be reasonable Director of Corrections rule D2601, which provides *inter alia* that inmates shall have access to such lawbooks as are available at a designated place in the institution, ordinarily the prison library, but that no lawbooks shall be taken from that place by any inmate. A corollary thereto is rule D2602, which declares in relevant part that "No inmate shall assist or receive assistance from another in the preparation of legal documents. Any brief or petition not pertaining to his own case found in the possession of an inmate shall be confiscated." The latter is also a reasonable exercise of the statutory authority of the Director of Corrections over the "supervision, management and control" of the state prisons (Pen. Code, § 5054), for such trafficking in writs may well tend to result in unhealthy or dangerous inmate relationships and create substantial custodial problems.

■ The precise question here presented is the propriety of an inmate's possessing in his cell the fruits of legal research conducted by him at an authorized time and place. Under the rules currently in force, the answer must turn on the nature and purpose of the materials challenged in each case. If the inmate is in the process of preparing a petition to a court seeking some form of relief in his own behalf, he may possess such legal materials as he intends to incorporate into that document: although such petition should ordinarily be predicated on a full and honest statement of the *facts* which the inmate believes give rise to a remedy (*In re Chessman* (1955) 44 Cal.2d 1, 10 [279 P.2d 24]; *In re Swain* (1949) 34 Cal.2d 300, 302, 304 [209 P.2d 793]), the relevance of certain facts may not be apparent to him until he has done some legal research on the point. Admittedly such lay efforts more frequently are a hindrance than a help to the courts, but there is no reason to forbid the inmate from submitting his legal arguments for whatever guidance they may provide. Accordingly, "reasonable access to the courts" includes not only the right to place a petition for relief in the mails (*In re Ferguson* (1961) 55 Cal.2d 663, 676-678 [12 Cal.Rptr. 753, 361 P.2d 417]), but also the right to possess in his cell the legal mate-

rials which the inmate desires to include in such a document while they are being collated into mailable form.[3]

On the other hand, too often legal materials found in an inmate's cell are all-purpose compendiums which serve merely as a substitute for removal of lawbooks from the library in violation of rule D2601, or as writ forms or models for the assistance of other inmates in violation of rule D2602. Such materials properly may be confiscated as contraband.

Here a bona fide effort appears to have been made to comply with the order of the superior court. On July 26, 1966, the prison authorities returned to petitioner "All copies of writs, legal papers, documents and correspondence pertaining to his case" that were found in the cell of inmate Sullivan. At the same time, a variety of other legal materials were confiscated and destroyed. Some were clearly contraband under the standards just discussed, while others are insufficiently described in the record to enable us to determine their nature. As to the latter, however, the point may be deemed to be moot, for petitioner has since filed the present detailed application for habeas corpus and is now represented by counsel. Hereafter, the prison authorities should exercise care and discretion to draw the foregoing distinction in individual situations.

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[3]We do not mean to imply that the prison authorities may not promulgate a rule, should they see fit, which limits to the prison library or similar facility all inmate activities of a legal nature, and prohibits inmates from using their cells for storing their legal research notes or preparing legal documents of any kind. Such restrictions have been held in various federal decisions not to constitute an unreasonable impediment on the right of inmates to access to the courts. (*Hatfield* v. *Bailleaux* (9th Cir. 1961) 290 F.2d 632, 638, 640; *Austin* v. *Harris* (W.D. Mo. 1964) 226 F.Supp. 304, 307.)