[Crim. No. 23094. First Dist., Div. Four. Feb. 18, 1983.]

In re ROBERT SEABOCK on Habeas Corpus.

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Linda Ludlow and Ronald A. Bass, Deputy Attorneys General, for Appellant.

Thomas J. Nolan, Nolan, Constantinides & Parnes and Nolan & Parnes for Respondent.

OPINION

**POCHÉ, J.**—The People appeal from an order of the Marin County Superior Court in a habeas corpus proceeding[1] which directs the Board of Prison Terms (Board) to "set aside its determination that [Robert Seabock] is unsuitable for parole, determine that [he] is suitable for parole, and then proceed to fix [his] parole release date in accordance with the appropriate guidelines."

We reverse.

*Facts*

In 1974, Seabock was sentenced to life in state prison upon conviction of first degree murder and other offenses. (§§ 187, 189.)[2] His minimum eligible parole date was computed to be December 13, 1979.

In December of 1979, Seabock was found unsuitable for parole by a three-member panel of the Board.

Following an unsuccessful administrative appeal, Seabock initiated habeas corpus proceedings in Marin County Superior Court. He alleged that the application of the determinate sentencing law (DSL) guidelines to a prisoner who had been sentenced under the indeterminate sentencing law (ISL) constituted a denial of equal protection (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) and a violation of the ex post facto clause (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9.)

The trial court concluded that application of the DSL parole standards to Seabock violated the ex post facto clause.[3]

*Discussion*

■ Both the United States Constitution (art. I, § 9, cl. 3; art. I, § 10, cl. 1) and the California Constitution (art. I, § 9) prohibit the enactment of an ex post facto law.

---

[1]Penal Code section 1506 permits an appeal by the People from a final order of the superior court granting relief by habeas corpus.

*Unless otherwise indicated, all further statutory references are to the Penal Code.*

[2]Seabock was also convicted of assault with a deadly weapon (§ 245, subd. (a)) and two weapon enhancements were found true (§§ 12022, 12022.5).

[3]The superior court found that: (a) the record before it "reflects that the sole reason for the Board's determination was the gravity of the offense"; (b) the DSL allows the Board to base its finding of unsuitability for parole solely on the gravity of the offense; and (c) at the time Seabock was sentenced, there was no similar provision of law.

Recently the United States Supreme Court explained the workings of the clause: "two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, [fn. omitted] and it must disadvantage the offender affected by it. [Fn. omitted; citations.]" (*Weaver* v. *Graham* (1981) 450 U.S. 24, 29 [67 L.Ed.2d 17, 23, 101 S.Ct. 960].) A law need not impair a vested right to violate the ex post facto prohibition: "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense. [Fn. omitted.]" (*Weaver* v. *Graham, supra,* 450 U.S. at pp. 30-31 [67 L.Ed.2d at p. 24].)[4]

Seabock contends, and the trial court agreed, that the application of the DSL guidelines for determining parole suitability to one who had committed a crime and had been convicted during the time that the ISL was in effect is a violation of the ex post facto clause.

There can be no doubt that application of a law (the DSL) enacted more than five years after the offenses for which Seabock was imprisoned is—as to that prisoner—a retrospective application of that law within the meaning of *Weaver* v. *Graham*.

The more difficult question—the second prong of *Weaver* v. *Graham*—is whether this admittedly retrospective application "disadvantaged" Seabock. It is not enough to prove that a law is applied retrospectively. It must also be demonstrated that it has the potential of hurting more than the law it replaced. The question before us is did the law applied to Seabock to deny him parole (DSL) "disadvantage" him any more than if the ISL had been used to determine his suitability for parole?

Since disadvantage in the ex post facto context is a comparative concept, an historical examination must first be made of the standards for determining parole eligibility which existed at the time Seabock committed his offenses: October 6, 1972.

---

[4]In *Weaver* v. *Graham, supra,* 450 U.S. 24, the court held that a Florida statute which changed the computation of "gain time credits" violated the ex post facto clause. In *Lindsey* v. *Washington* (1937) 301 U.S. 397 [81 L.Ed. 1182, 57 S.Ct. 797], the court held that legislation which amended a discretionary 15-year sentence to a mandatory 15-year term could not be applied retrospectively. In *Greenfield* v. *Scafati* (D.Mass. 1967) 277 F.Supp. 644 (a three-judge panel), affirmed, 390 U.S. 713 [20 L.Ed.2d 250, 88 S.Ct. 1409], the court held that legislation which made "good conduct credits" forfeit if parole conditions were violated could be constitutionally applied only to prisoners whose crimes were committed after the statute was enacted.

■ An accurate picture of how and under what standards the Adult Authority, the entity then empowered to determine suitability for parole, exercised that authority is found in the law reviews and in the cases. One writer describes the situation starkly: "The Legislature has given no guidance to the Adult Authority in the way of criteria for decision making; the courts have likewise largely abstained from establishing criteria or ruling on the validity of factors considered by Adult Authority panels except to say that the agency must, 'discharge its responsibilities in good faith, neither arbitrarily nor capriciously. . . .' Neither has the Adult Authority developed a formal set of criteria for the fixing of sentences or the granting or denial of parole. Chairman Kerr presented a list of 'factors most often considered' as to the parole decision in testimony before a subcommittee of the House Committee on the Judiciary on October 25, 1971:

"1. Details of current commitment offense.

"2. Extent and nature of criminal history and/or behavior pattern.

"3. Probation officer's presentence report and subject's attitude toward offense.

"4. Views of trial judge and district attorney.

"5. Views of defense counsel and any interested parties.

"6. Social and psychological history.

"7. Time served on current commitment offense.

"8. Response to institutional program in terms of participation and accomplishments.

"9. Present attitude toward offense and future.

"10. Insight into personal and family problems.

"11. Psychiatric evaluations (including prognosis) when required by law or Board order.

"12. Nature and degree of threat to public safety.

"13. Plans and preparation for release on parole, including job offers, reasonable employment opportunities, family support, and living arrangements.

"He defended the failure of the Adult Authority to adopt and promulgate more detailed, formal criteria, asserting that new factors are added based upon ongoing research and that factors considered necessarily vary with each case.

"A Report of the Assembly Committee on Criminal Procedure, highly critical of the lack of standards guiding the parole decision process, asserted that the time spent in prison, 'seems to depend on three factors:

" '1. The values and feelings of individual parole board members.

" '2. The mood of the public.

" '3. Institution population pressures.'

"Absence of formal criteria together with lack of written reasons for decisions and the unilateral nature of most decisions result in a completely discretionary and therefore possibly arbitrary decision process." (Comment, *The California Adult Authority—Administrative Sentencing and the Parole Decision as a Problem in Administrative Discretion* (1972) 5 U.C. Davis L.Rev. 360, 373-375 [fns. omitted].)

The comment writer then concludes with plain language terseness not characteristic of law review prose: "The Adult Authority exercises tremendous power in fixing sentences and deciding on paroles. It presently does so with almost unlimited discretion. Its case load is heavy and the hearings brief. In practice, the decision on which the liberty of the prisoner turns is made unilaterally by one man who is not guided by formal criteria and who is not legally required to justify his decision." (*Id.*, at pp. 381-382.)

That absence of formal criteria is more politely described in the cases. For example, the California Supreme Court painted the picture this way: "In this state the parole power is vested in the Adult Authority. [Citation.] While a prisoner eligible for parole has the right to apply therefor and to have his application duly considered, he has no right to a parole at any fixed time, or at all; the decision to grant or deny parole is committed entirely to the judgment and discretion of the Adult Authority. [Citations.] 'In determining whether the privilege of parole shall be granted a prisoner, that authority is not guided solely by the good conduct of the prisoner while incarcerated. *The nature of his offense,* his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation and *the interests of public security* are all taken into consideration.' [Citation.]" (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200], italics added; see also *In re Minnis* (1972) 7 Cal.3d 639, 644-645, and fn. 6 [102 Cal.Rptr. 749, 498 P.2d 997].) This court described the reality under the ISL this way: "The exercise of

this discretion involves the deliberate assessment of a wide array of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public." (*In re Fain* (1976) 65 Cal.App. 3d 376, 389 [135 Cal.Rptr. 543].)

Thus, at the time Seabock committed his crimes the Adult Authority was vested by law with a broad discretion to grant or deny parole and in exercising that discretion the Adult Authority considered the gravity of the offense.[5]

The fulcrum of Seabock's ex post facto claim rests on his understanding of decisional law which he reads as establishing that under the ISL a prisoner could not be found unsuitable for parole solely on the basis of his commitment offense. He misunderstands those decisions: *In re Stanley* (1976) 54 Cal. App.3d 1030 [126 Cal.Rptr. 524]; *In re Minnis, supra,* 7 Cal.3d 639; and *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].

*In re Stanley* held invalid a directive by the chairman of the Adult Authority prescribing a base offense for each parole applicant and directing the selection of either a typical or an aggravated range for the base term. Within the appropriate base range, the panel was to fix a base period of confinement and was told that "The primary factor in fixing the base period is the seriousness of the commitment offense; other factors such as the inmate's age, pattern of criminality, and 'serious or major disciplinary offenses' may be considered." (*Id.,* 54 Cal.App.3d at pp. 1034-1035.) Striking down the directive the court noted that "It disregards the law's demand to weigh all, not part, of the relevant factors. [Citation.] Its reliance upon a table of time increments clashes with the [ISL's] discerned demand for reasoned individualization." (*Id.,* at p. 1040.)

In *In re Minnis,* petitioner urged that the Adult Authority had abused its discretion by creating a "blanket rule" denying parole to prisoners who sold drugs for profit. The Supreme Court made clear that such an administrative policy would violate the spirit and frustrate the purpose of the ISL and the parole system. (*Id.,* 7 Cal.3d at p. 645.) "Many factors are to be considered by the Authority in deciding whether to fix a sentence at less than maximum and whether to grant parole. Although good conduct while incarcerated and potential for reform are not the only relevant factors,[6] this court has acknowledged their significance. [Citations.] Furthermore, the Authority has declared that

---

[5]Indeed, the first factor listed by Chairman Kerr was addressed to the nature of the commitment offense.

"[6]The nature of the offense, the age of the offender, his prior associations, his habits, his inclinations, his traits of character, and the interest in public security are also to be considered. (*In re Schoengarth* (1967) 66 Cal.2d 295, 300.)"

these factors are among those of 'paramount importance.' [Citations.]" (*Id.*, at pp. 644-645.)

The court further emphasized that "[a]n administrative policy of rejecting parole applications solely on the basis of the type of offense with the result that the term of imprisonment is automatically fixed at maximum, although the Authority action includes a pro forma hearing and review of the cumulative case summary, does *not* satisfy the requirements of individualized treatment and 'due consideration.'" (*Id.*, at p. 647, italics in original.) Although admitting that the Authority could have denied the petitioner parole and set the term at the maximum in light of the evidence that he had sold drugs on a large scale, the court concluded that "the nature of petitioner's offense does not justify the Authority's refusal *in advance* to consider future applications . . . ." (*Ibid.*, italics in original.)

*People* v. *Morse*, reiterates that in fixing the term of imprisonment the Adult Authority does not act "pursuant to a formula of punishment." (*Id.*, 60 Cal.2d at pp. 642-643.)

These cases do not prohibit the Adult Authority from denying parole on the basis of the nature of the underlying offense but prohibit a blind, automatic, categorical exclusion from parole without *consideration* of other factors. They require the Adult Authority to exercise its discretion after looking at all of the factors relevant to a particular prisoner on an individual basis. Chief Justice Wright speaking for the court explained this in *In re Minnis, supra*, 7 Cal.3d at page 645: "Any official or board vested with discretion is under an obligation to consider *all* relevant factors [citation], and the Authority cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature." In almost the same breath he distinguished and approved the exercise of such discretion by the Authority to retain a prisoner for the maximum period because "*among other factors*, he employed a high degree of violence in committing the crimes for which he was convicted." (*Id.*, at p. 645, fn. 7, italics added.)[6]

Forbidden are determinations not based in fact upon an entire picture, refusals in advance, or pro forma hearings which completely disregard the individual prisoner's conduct in prison and his disposition toward reform. (*In re*

---

[6]Footnote 7 in its entirety reads: "The People cite *People* v. *Logan* (1966) 244 Cal.App.2d 795 [53 Cal.Rptr. 549] for the proposition that the Authority may fix the term at maximum and deny parole at the outset of imprisonment while refusing future reconsideration, all on the basis of the type of crime committed. We give *Logan* no such reading. That case said only that a prisoner may be retained in prison for the maximum period because, among other factors, he employed a high degree of violence in committing the crimes for which he was convicted. In contrast to the situation here, the *Logan* case did not concern a policy of like treatment for all persons convicted of a particular type of offense."

*Minnis, supra,* at p. 647.) Instead, the Adult Authority was required to consider numerous factors in setting the term of imprisonment and in deciding whether to grant parole. Any system of automatic exclusion was prohibited. These decisions do not prohibit the authority from denying parole on the basis of the nature of offense in an individual case. Indeed, in *People* v. *Logan* (1966) 244 Cal.App.2d 795, 798 [53 Cal.Rptr. 549], disapproved on other grounds in *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534], the court commented that when fixing the term of imprisonment and eligibility for parole, the authority "may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant in his criminal career."

Thus nothing in the ISL, or in the decisions interpreting that law or its implementation, prohibited the authority after a full hearing from denying parole on the basis of the nature of the commitment offense in an individual case. To the contrary, the Adult Authority was vested with broad discretion under the ISL to determine suitability for parole, and it was proper for the authority to consider the nature and the particular circumstances of the offense. What was not proper was a "blanket rule" denying parole based on the nature of the offense without individual consideration of the facts of the parole applicant.

Next, our focus turns to the standards that were actually applied to Seabock seven years after his offenses. When the DSL came into effect on July 1, 1977, the Legislature, in an exercise it had not engaged in under the ISL, set forth by statute guidelines for determining whether to set release dates for life prisoners. (§ 3041.)[7] The Community Release Board (now the Board of Prison Terms)

[7]Section 3041 now provides: "(a) In the case of any prisoner sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Prison Terms shall meet with each such inmate within the first year of incarceration solely for the purposes of reviewing the inmate's file and making recommendations. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two members of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime. At least one member of the panel shall have been present at the last preceding meeting, unless it is not feasible to do so or where the last preceding meeting was the initial meeting. Any person on the hearing panel may request review of any decision regarding parole to the full board for an en banc hearing. In case of such a review, a majority vote of the full Board of Prison Terms in favor of parole is required to grant parole to any prisoner. [¶] (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting. [¶] (c) For the purpose of reviewing the suitability for parole of those prisoners eligible for parole under prior law at a date earlier than that calculated under Section 1170.2, the board shall

was explicitly empowered to "establish criteria for the setting of parole release dates" and was told that in doing so it "shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime." (§ 3041, subd. (a); see also § 3052.) The Legislature further instructed the Board to "set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041, subd. (b).)

Thus the Legislature's primary command to the Board is that it "*shall* set a parole release date." The only exception to that mandate is one solely within the discretionary power of the Board: if it—not the Legislature—finds that the "gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual. . . ." (§ 3041, subd. (b).)

Our reading of the statute does not disclose any legislative intention to set aside the case authority which requires the parole setting body to consider all of the relevant facts prior to making a determination with respect to a prisoner's suitability for parole. Instead, the statute continues to demand what the case law required under the ISL: a weighing process, an exercise of discretion based upon all of the relevant factors.

This interpretation of the statute is exactly the reading that the Board gave in drafting its regulations[8] (Cal. Admin. Code, tit. 15, § 2281) thereunder which

---

appoint panels of at least two persons to meet annually with each such prisoner until such time as the person is released pursuant to such proceedings or reaches the expiration of his term as calculated under Section 1170.2"

[8]California Administrative Code, title 15, section 2281 provides: "(a) General. The panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. [¶] (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability. [¶] (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include: [¶] (1) Commitment Offense. The prisoner committed the offense

in plain English call for a "judgment of the panel" whether "the prisoner will pose an unreasonable risk of danger to society if released from prison." (*Id.*, subd. (a).) That judgment is to be made after the Board considers "[a]ll relevant, reliable information" (*id.*, subd. (b)) which is described in detail in the regulations and is not limited to the nature or details of the crimes involved. (*Id.*, subds. (b), (c), and (d).)

██ Added to our reading of the legislative intent and the Board's interpretation of that intent is the actual determination of the three-member panel finding Seabock unsuitable for parole: "1. The commitment offenses: He committed the offenses in an especially heninous [*sic*] and cruel manner. Multiple victims were attacked, one killed and the other wounded. The offenses were carried out in a dispassionate and calculated execution-style manner. The prisoner and crime partners had already effected the release of the prisoner from the unarmed correctional officers. After handcuffing one victim, both victims were placed in the rear seat of the car, and the prisoner shot the officers with a Ruger security six 357 Magnum revolver, using Smith and Wesson 357 Magnum bullets. The prisoner was only 2 to 18 inches from the victims. [¶] In their press release shortly after the killing, the organization hailed the event as a

---

in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense. [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. [¶] (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense. [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail. [¶] (d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include: [¶] (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time. [¶] (5) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (6) Age. The prisoner's present age reduces the probability of recidivism. [¶] (7) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (8) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

political victory. Apparently the motive for shooting the officers was to obtain maximum publicity for their revolutionary efforts. [¶] After arriving home in Palo Alto by automobile, the prisoner caught an airplane and flew to Los Angeles with a friend so he could buy another 357 Magnum to replace the murder weapon. After returning home, he removed the barrel of the gun and threw it off the Bay Bridge; [¶] 2. The gravity and nature of the offenses have not been outweighed by the prisoner's minimal criminal history, his outstanding institutional behavior and accomplishment, his psychiatric diagnosis of 'no mental illness' and his realistic parole plans. More time is needed to observe and evaluate the prisoner before a finding of suitability can be made. [¶] Therefore, the prisoner is found unsuitable for parole."

It cannot be said that Seabock could be disadvantaged by application of the DSL guidelines to him; these newer regulations do not in any way decrease his parole eligibility or chance therefor. Retrospective application of DSL regulations to him does not violate the ex post facto clause of either the United States or the California Constitution. What these newer—ex post—rules do is spell out what was always the fact and the law: the parole-setting agency is empowered to deny parole only after due consideration of all relevant factors including but not limited to the gravity and circumstances of the crimes involved.

The recent decision of *In re Stanworth* (1982) 33 Cal.3d 176 [187 Cal.Rptr. 783, 654 P.2d 1311], does not compel the contrary conclusion. There, the California Supreme Court addressed the question of which parole *release* guidelines apply to a person sentenced to life under the ISL. Stanworth had been sentenced to life under the ISL but had not been found suitable for parole until 1979, long after the DSL had come into effect. The Board of Prison Terms fixed his term of imprisonment—that is, set a parole release date—by exclusive application of DSL guidelines. After comparing the ISL guidelines[9] and the DSL guidelines for setting a parole release date of a life prisoner the Supreme Court concluded: (1) the DSL guidelines set a longer range of base terms for first degree murder; (2) the DSL guidelines required the imposition of additional terms for particular enhancements unless deviation from the norm was expressly justified, whereas under the ISL the panel was merely given the discretion to make adjustments; (3) the DSL differed in the computation of post conviction credits; and (4) the DSL rules "generally reflect an attempt to achieve uniformity and stress the criminal activities of the inmate rather than any social or personal factors." (*In re Stanworth, supra,* 33 Cal.3d at pp. 183-186.)

---

[9]The inmate was sentenced in 1966. At that time, as we have noted, there were no written guidelines in determining parole release dates. The first written guidelines were promulgated in 1976. It is these 1976 regulations which the Supreme Court utilized to compare the implementation of parole standards under the ISL and the DSL. (*In re Stanworth, supra,* 33 Cal.3d at pp. 182-183.)

Utilizing the prohibition of the ex post facto clause, the court framed the issue before it as "whether the standards by which defendant's date of release is to be determined have been altered to his detriment." (*Id.*, at p. 186.) In answering this question in the affirmative, the court commented: "Defendant's postconviction behavior was treated under DSL very differently from the manner contemplated under the 1976 regulations. It appears that the 'standard of punishment' has substantially changed because postconviction behavior is no longer utilized in the same manner in determining his parole release date. We cannot predict with certainty the administrative effect on defendant of this change. In such a posture we are guided by the high tribunal's statement that '[t]he inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual.' (*Weaver* v. *Graham, supra,* 450 U.S. at p. 33.) This alteration in the law may well be to defendant's disadvantage because his postconviction behavior has been given different weight in the fixing of his term." (*In re Stanworth, supra,* 33 Cal.3d at p. 187.)

For those reasons, the court concluded that the application of DSL guidelines for determining a parole release date altered the standard of punishment to the inmate's prejudice in violation of the ex post facto clause. The court held that the inmate was entitled to parole release consideration under *both* ISL and DSL standards, and to the benefit of the more favorable determination. (*Id.*, at p. 188.)

As our analysis has shown, the standards for determining suitability for parole have not been altered under the DSL. The criteria utilized under the ISL as developed through practice and as modified by case law were not altered by the DSL. Accordingly, ex post facto principles have not been violated. Similarly, since there is no real change in the methods or criteria for determining parole eligibility, no equal protection violation exists.

The judgment is reversed.

Caldecott, P. J., and Rattigan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 20, 1983. Kaus, J., did not participate therein. Broussand J., was of the opinion that the petition should be granted.