[Crim. No. 11235. Third Dist. June 15, 1983.]

In re PATRICK DUARTE on Habeas Corpus.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Ramon M. de la Guardia, Deputy Attorneys General, for Appellant.

Michael R. Snedeker, under appointment by the Court of Appeal, for Respondent.

OPINION

**CARR, J.**—The People appeal from an order granting Patrick Duarte's petition for writ of habeas corpus. (Pen. Code, § 1506.) We first considered this

appeal and reversed the order. (*In re Duarte* (3 Crim. 11235, Jan. 11, 1982).) Hearing was granted (Supreme Ct. No. 22527, Mar. 17, 1982) and the matter was returned to this court for reconsideration in light of *In re Stanworth* (1982) 33 Cal.3d 176 [187 Cal.Rptr. 783, 654 P.2d 1311].

Upon reconsideration, we conclude *Stanworth* resolves the question of how petitioner's parole release date is to be determined, the topic of our previous opinion, but does not address the more narrow issue of how petitioner's initial *suitability* for parole is to be determined. Having reexamined this issue, we have determined our prior opinon nonetheless reached the correct result. We shall therefore reverse.

On January 6, 1969, Patrick Duarte robbed a gas station and repeatedly shot the attendant because of the small amount of money available. He was convicted of first degree murder and first degree robbery and was sentenced to life in prison. His minimum eligible parole date was February 1, 1977.

While serving his prison term, Duarte was convicted on October 26, 1978, in San Bernardino County Superior Court of assault on a correctional officer and sentenced to a concurrent term of 16 months.

In February 1979 and 1980, Duarte's suitability for parole was evaluated in accordance with guidelines set forth in California Administrative Code, title 15, section 2281. He was found unsuitable as posing an unreasonable risk of danger to society by reason of his violent history, his serious and continuing misconduct in prison (having been found responsible for 37 disciplinary infractions), and psychiatric diagnoses of an antisocial personality disorder and drug dependence on barbiturates.

Duarte then brought the instant petition alleging that at the time of his crime the indeterminate sentencing law (ISL) was in effect, but that at his parole hearing in 1980 his suitability for parole was judged under the determinate sentencing law (DSL) regulations, enacted after his incarceration. While conceding he may have been found unsuitable for parole under the former ISL regulations, petitioner contends the exclusive application of the DSL regulations constitutes an ex post facto law, and a denial of equal protection. He asserts he will eventually be found suitable for parole and is therefore entitled to annual hearings pursuant to both sets of rules, and application of the earliest of the two parole release dates. That was the order of the trial court.[1]

---

[1] The court's order recited: "On both ex post facto and equal protection grounds, petitioner is constitutionally entitled to an immediate parole release hearing pursuant to the standards of punishment in effect under the Indeterminate Sentence Law as well as the Determinate Sentence Law, and annual hearings thereafter, and to have a parole release date fixed pursuant to whichever release date provides the lesser period of prison confinement."

It is now established that petitioner, when eligible for parole, will be entitled to have his parole release date determined pursuant to both the regulations in effect under the ISL and the current DSL guidelines, and be given the earlier of the two dates. (*In re Stanworth* (1982) 33 Cal.3d 176, 188 [187 Cal.Rptr. 783, 654 P.2d 1311].) *Stanworth,* however, considered only the two sets of regulations as they applied to a prisoner's parole release date. That case did not involve the question of which regulations apply in making the initial determination of whether the prisoner is suitable for parole.[2] Having reexamined this question in light of *Stanworth*'s discussion of ex post facto laws, we conclude exclusive application of the DSL regulations governing suitability for parole to Duarte constitutes neither an ex post facto law nor a denial of equal protection of the law.

## DISCUSSION

■ Both the United States Constitution (art. I, § 9, cl. 3; art. I, § 10) and the California Constitution (art. I, § 9) prohibit the enactment of an ex post facto law. "In general, 'any law which was passed after the commission of the offense for which the party is being tried is an *ex post facto* law, when it inflicts a greater punishment than the law annexed to the crime at the time it was committed [citations]; or which alters the situation of the accused to his disadvantage. . . .' (*Ex parte Medley, Petitioner,* 134 U.S. 160, 171 [10 S.Ct. 384, 33 L.Ed. 835].)" (*People* v. *Ward* (1958) 50 Cal.2d 702, 707 [328 P.2d 777, 76 A.L.R.2d 911], disapproved on another point in *People* v. *Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." (*Weaver* v. *Graham* (1981) 450 U.S. 24, 30-31 [67 L.Ed.2d 17, 24, 101 S.Ct. 960].) ■ There was a retrospective application of the DSL guidelines to Duarte and the issue before us is whether the DSL parole suitability guidelines are "more onerous" than the ISL guidelines or have altered Duarte's situation to his disadvantage.

At the time Duarte committed his offenses the power to determine a prisoner's suitability for parole was "vested in the Adult Authority. [Citation.] While a prisoner eligible for parole has the right to apply therefor and to have his application duly considered, he has no right to a parole at any fixed time, or at all; the decision to grant or deny parole is committed entirely to the judgment

---

[2]Stanworth had been found parole-ready in 1979. (*In re Stanworth, supra,* 33 Cal.3d at p. 179.)

and discretion of the Adult Authority. [Citations.] 'In determining whether the privilege of parole shall be granted a prisoner, that authority is not guided solely by the good conduct of the prisoner while incarcerated. The nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation and the interests of public security are all taken into consideration.'" (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].) "The exercise of this discretion involves the deliberate assessment of a wide array of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public." (*In re Fain* (1976) 65 Cal.App.3d 376, 389 [135 Cal.Rptr. 543].) Until 1976, no formal regulations were established to guide the exercise of the Adult Authority's discretion. As one commentator noted, this "[a]bsence of formal criteria together with lack of written reasons for decisions and the unilateral nature of most decisions result in a completely discretionary and therefore possibly arbitrary decision process." (Comment, *The California Adult Authority—Administrative Sentencing and the Parole Decision as a Problem in Administrative Discretion* (1972) 5 U.C. Davis L.Rev. 360, 373-375.)

Partially in response to this situation, regulations were promulgated in 1976 in title 15 of the California Administrative Code. These parole board rules (hereinafter PBR) were relatively short-lived, being superseded by DSL regulations, the Board of Prison Terms rules (hereinafter BPT), in 1978.[3] The PBR were somewhat limited in their consideration of a prisoner's suitability for parole. They provided that at a prisoner's initial parole hearing, an inmate could be found unsuitable if "in the opinion of the hearing panel an unreasonable risk of danger to society would be posed by release." (PBR § 2300.)[4] The parole board was given examples of types of factors that could be considered in determining unsuitability. (PBR § 2031.)[5] If parole was denied, the board

[3]While we find it interesting that petitioner asks us to compare two sets of rules which were both passed considerably after the date of the commission of his offenses, we are guided by the Supreme Court's admonition "that these regulations offer a convenient means by which to compare the implementation of parole standards under each statutory scheme." (*In re Stanworth, supra,* 33 Cal.3d at p. 183.) We must confess to being perplexed, however, over what regulations we should compare had there been *more* than two sets enacted since Duarte's conviction. We are fortunate the field of choice was so conveniently limited.

[4]PBR section 2300 provided: "The first step in considering an inmate for parole is to determine whether he is suitable for release on parole. An inmate is unsuitable for release on parole and will be denied parole if in the opinion of the hearing panel an unreasonable risk of danger to society would be posed by release. Before an inmate is denied parole for unsuitability, the hearing panel should consider any conditions of treatment or control under which the inmate could safely be released to the community, including the use of special conditions (see § 2478). If parole is denied, the hearing panel may recommend to the inmate what steps may be undertaken to enhance the possibility of a grant of parole at a future hearing. In all cases where parole is denied, a definitive list of the specific, factual reasons for denying parole will be given the inmate in writing."

[5]PBR section 2301 provided: "Examples of factors which will be considered in determining whether an inmate is unsuitable for release on parole include: [¶] (a) History of violent attacks

could inform the prisoner what he might do to increase his chances of parole, and was required to give him a written statement of reasons for the denial. (PBR § 2300.) The inmate was then entitled to subsequent reviews every one or two years. (PBR § 2304, subd. (a).)[6]

It is apparent from these regulations the discretion of the Community Release Board was not greatly diminished by the PBR rules. An inmate could be denied parole if his release posed an "unreasonable risk of danger to society" and the board was given only *examples* of factors to consider, such as a history of violent or sexual attacks on others. (PBR §§ 2300, 2301.) The factors previously used in determining suitability for parole remained relevant criteria under the PBR. The question of suitability was still an individualized balancing of the interests of the inmate and the public. (*In re Fain, supra,* 65 Cal.App.3d at p. 389.)

Upon passage of the DSL, new parole regulations were promulgated which, inter alia, set a longer range of base terms for first degree murder and required the imposition of certain sentence enhancements. The goal was to achieve uniformity of sentences and stress the criminal activities of the inmate rather than social or personal factors. (*In re Stanworth, supra,* 33 Cal.3d at p. 186.) These changes, however, were primarily concerned with the inmate's parole release date. Regarding an inmate's suitability for parole, the Legislature left a "consideration of the public safety" as the fundamental criterion in assessing suitability.[7] In implementing this legislative directive, the Board of Prison Terms followed the same procedure as existed under the PRB. At the life prisoner's initial parole hearing, the board must first determine the prisoner's suitability for parole. The prisoner is unsuitable if "in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (BPT § 2281, subd. (a).) This risk of danger to society is to be assessed in light of "[a]ll relevant, reliable information available to the panel . . . ." (BPT 2281, subd. (b).) This includes the prisoner's social history, mental state, criminal history, present offenses, and behavior after the crime. The

on others. [¶] (b) History of forcible sexual attacks on others. [¶] (c) The presence of a psychiatric or psychological condition related to the inmates' criminality which creates a high likelihood that new violent crimes will be committed. [¶] (d) A pattern of criminal behavior which is so persistent that substantial evidence of change for the better must be demonstrated."

[6]PBR section 2304, subdivision (a) provided: "Inmates Eligible for Parole. In all cases where parole is denied to inmates legally eligible for parole, subsequent parole hearings will be scheduled by the hearing panel. Ordinarily, a parole hearing will be scheduled 12 months after the most recent parole hearing, but may be scheduled up to 24 months after the most recent parole hearing if the reasons for doing so are stated."

[7]Penal Code section 3041, subdivision (b) provides: "The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

panel is given a list of factors which tend to indicate either suitability or unsuitability for parole.[8] Upon making a determination on suitability, if parole

[8]BPT section 2281 provides in relevant part: "(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

"(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultous relationships with others.

"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

"(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

"(5) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(6) Age. The prisoner's present age reduces the probability of recidivism.

"(7) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(8) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

status is denied the prisoner must be given a written statement of "the panel's reasons . . . , activities which might be of benefit during imprisonment, and when the prisoner can expect to have another parole consideration hearing." (BPT § 2268.) The subsequent hearing can be "no sooner than 12 months and no later than 14 months following any parole consideration hearing at which parole was denied." (BPT § 2270, subd. (c).)[9]

In comparing these regulations, similarity is immediately apparent. *In re Stanworth* recognized, "[u]nder both the 1976 and the current rules, a life prisoner must first be found suitable for parole before a parole date is set."* (*In re Stanworth, supra,* 33 Cal.3d at p. 183; italics added.) Under both sets of rules the parole suitability decision involves a case-by-case analysis of all relevant factors, the basic criteria being whether the prisoner's release creates an "unreasonable risk of danger to society." (BPT § 2281, subd. (a); PRB § 2300.) While the current regulations specify in much greater detail the criteria to be examined in determining suitability, both sets of regulations contemplate a consideration of *all* relevant information, and the factors mentioned are merely *examples.* (BPT § 2281, subds. (b), (c); PBR § 2301.) This must be compared with the disparity in the regulations regarding parole release dates, where the BPT rules reflected a change in penal philosophy through a generalized increase in terms of imprisonment, focusing on a prisoner's crimes, rather than his progress toward rehabilitation. (*In re Stanworth, supra,* 33 Cal.3d at pp. 185-187.)

As to the parole suitability provisions, there has been neither a change in philosophy, nor a change in the criteria used to reach a decision. The only substantive changes we perceive in the regulations are: (1) under the BPT rules a written decision to deny parole must now include suggestions for increasing the chance of parole, and the expected date of the next hearing (BPT § 2268) as well as the reasons for the denial (in PBR § 2300 the suggestions for improvements were optional); and (2) under the PBR the subsequent parole suitability hearing could be held between 12 and 24 months after a denial (PBR § 2304, subd. (a)), whereas under the PBT the hearing must be held within 12 to 14 months (BPT § 2270, subd. (c)). These changes can in no way be said to work to the "disadvantage," or be "more onerous" on an ISL life prisoner such as Duarte. If anything, use of the BPT rules works to the prisoner's benefit.[10]

---

[9]We note the PRB regulations were carried forward into the BPT rules substantially unchanged in an article entitled "Parole Consideration Procedures for ISL Prisoners." (BPT § 2300 et seq.) The obvious intent of this article was to provide ISL prisoners with the same criteria for parole as existed on the date of their original offense. Particularly pertinent are the sections regarding parole suitability, found at sections 2304, 2306, and 2316, which restate the PBR regulations on parole suitability practically verbatim.

[10]Under the BPT rules the prisoner is insured more frequent parole suitability hearings, is given *written* suggestions from the panel on how to change his conduct so as to increase his chances of parole, and the board is given a broad range of previously unlisted examples of factors which tend to show a prisoner's *suitability* for parole, as well as factors which show his unsuitability.

We conclude the relevant criteria in determining suitability for parole have remained substantially unchanged in the two sets of regulations and that any changes in the new regulations have been to the petitioner's advantage. The First District Court of Appeal recently reached the same conclusion. In *In re Seabock* (1983) 140 Cal.App.3d 29 [189 Cal.Rptr. 310] (hg. den.), the court stated, "[i]t cannot be said that Seabock could be disadvantaged by application of the DSL guidelines to him; these newer regulations do not in any way decrease his parole eligibility or chance therefor." (P. 40.) We concur in that court's conclusion that "the standards for determining suitability for parole have not been altered under the DSL. The criteria utilized under the ISL as developed through practice and as modified by case law were not altered by the DSL." (P. 41.) Petitioner Duarte's ex post facto claim must fail as the law has not been changed to his disadvantage or become more onerous. Nor are we persuaded by his equal protection argument. If identical treatment is accorded *all* life prisoners, whether ISL or DSL, any claim of disparate treatment based on the date of the inmate's offense is without merit.

We therefore conclude the trial court erred in finding Duarte was "constitutionally entitled to an *immediate parole release hearing* pursuant" to both the ISL and DSL regulations. (Italics added.) Relying on his record of violence, his serious misconduct in prison, and a diagnosed psychopathology related to his criminal behavior, the Board of Prison Terms found Duarte unsuitable for parole and made specific recommendations which would increase his chances of obtaining parole. The criteria used by the board were the same criteria that would have been used under the PBR regulations. Duarte is not entitled to a parole release hearing until he is found to be suitable for parole. Exclusive application of the present BPT guidelines in determining his suitability for parole constituted neither an ex post facto violation nor a denial of equal protection as there has been no change in the law in this respect. Petitioner is correct that when and if he is found suitable for parole he is entitled to have his parole release date set under both the former PRB and present BPT regulations and receive the earlier of the two dates. (*In re Stanworth, supra,* 33 Cal.3d 176.) Until this initial threshold of parole suitability is crossed, however, the trial court erred in ordering petitioner a *Stanworth* hearing.

The order granting the petition for a writ of habeas corpus is therefore reversed.

Regan, Acting P. J., and Evans, J., concurred.